891 F.2d 1024
 58 USLW 2370
 Mark A. KAPLAN, Esq., Rabbi James S. Glazier and Reverend
Robert E. Senghas, Plaintiffs-Appellants,
v.
CITY OF BURLINGTON and Robert Whalen, Operations Manager of
Parks and Recreation Department, Defendants-Appellees.
 No. 469, Docket 89-7042.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 14, 1989.
Decided Dec. 12, 1989.
 
 Richard T. Cassidy, Burlington, Vt. (Hoff, Agel, Curtis, Pacht & Cassidy, P.C.; Steven Green, Vermont Law School, Chelsea, Vt., American Civil Liberties Foundation of Vermont, Inc., of counsel), for plaintiffs-appellants.
 John L. Franco, Jr., Burlington, Vt., Asst. City Atty., Office of City Atty. and Corp. Counsel, for defendants-appellees.
 Nathan Lewin, Washington, D.C. (Miller, Cassidy, Larroca & Lewin, of counsel), for Vermont Organization for Jewish Educ.--Lubavitch, amicus curiae.
 Before LUMBARD, FEINBERG and MESKILL, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 We are called upon once again to consider the constitutionality of the unattended, solitary display on public property of an obviously religious symbol during the Christmas holiday season. This time, however, the symbol on display is not a creche, as it was when this court last wrestled with the issue,[1] but a menorah. Since our decision in that case, the Supreme Court has decided County of Allegheny v. ACLU, --- U.S. ----, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). Although there are several separate opinions in Allegheny, with various concurrences and dissents, we believe that they indicate that the display of the menorah in this case is unconstitutional. Accordingly, for reasons developed more fully below, we reverse the judgment of the United States District Court for the District of Vermont that allowed the display, and remand for entry of judgment for plaintiffs.
 
 I. Background
 Proceedings in the District Court
 
 2
 Plaintiffs Mark A. Kaplan, Rabbi James S. Glazier and Reverend Robert E. Senghas commenced this action in June 1988 in the district court. Plaintiff Kaplan is an attorney, who resides and practices in Burlington, Vermont; Rabbi Glazier is the rabbi for the Temple Sinai Reform Jewish Congregation in Burlington; and Reverend Senghas was the minister of the First Unitarian Universalist Church of Burlington. Their complaint named the City of Burlington and Robert Whalen, operations manager of the City's Parks and Recreation Department, as defendants. Plaintiffs sought a declaratory judgment that the City's grant of a permit for the display of a menorah in City Hall Park would violate the Establishment Clause of the First Amendment, reproduced in the margin.[2] The permit was to be issued to the Vermont Organization of Jewish Education--Lubavitch (Lubavitch), a Vermont group of orthodox Jews. Plaintiffs also sought preliminary and permanent injunctions against display of the menorah in City Hall Park.
 
 
 3
 After discovery, the parties entered into a stipulation of facts, pertinent portions of which will be referred to below. Judge Franklin S. Billings, Jr., held an expedited hearing on consent of the parties, after which he issued an oral ruling in defendants' favor. Shortly thereafter, the judge filed a thorough written opinion, dated December 8, 1988, reported at 700 F.Supp. 1315 (D.Vt.). The judge held that the display of the menorah did not violate the Establishment Clause. This appeal followed.
 
 The Facts of the Dispute
 
 4
 The facts set forth below are taken from the stipulation of the parties, the opinion of the district court and the record and exhibits supplied to us by the parties.
 
 
 5
 City Hall Park, a plot of land containing 2 1/2 acres, is in a prominent location in Burlington. The City has 18 other parks, but as the name suggests, City Hall Park is in front of City Hall, the seat of Burlington city government. City Hall Park is a traditional public forum, and is frequently used by members of the public for a wide variety of social, artistic, commercial and political events, including fund raising.
 
 
 6
 There has been a limited history of religious activities in the Park. In the period 1982-1988, the City issued some 13 permits, in addition to those involved in this case, that suggested religious activity in the Park, e.g., permits to the WGLY Radio Station for Gospel message and music; to Roger Foster on behalf of various church organizations for a Jesus rally, with music and testimonies; and to the Maranatha Church for food and clothing distribution to the poor. However, none of these activities involved the use of the Park for as lengthy a period as that at issue here. Also, none of the permits involved display in the Park of an unattended, solitary religious symbol. Indeed, the Park has apparently never been used for this purpose.
 
 
 7
 The Vermont Lubavitch group is associated with a larger group of Orthodox Jews known as the Chabad Lubavitch, under the spiritual guidance of a respected rabbi who lives in Brooklyn, New York. The Lubavitch movement is a Hasidic sect that seeks to reawaken interest among Jews in traditional Judaism. The local Lubavitch rabbi in Burlington, Yitzchok Raskin, has acknowledged that the Lubavitch movement advocates the display of menorahs all over the country, and has personally participated in efforts to place menorahs on public property in Miami Beach, Florida, and New York City, New York.
 
 
 8
 A menorah is a religious symbol of the Jewish faith, and is recognized as such by the general public. The menorah is associated with Chanukah, a religious holiday observed by Jews during an eight-day period which ordinarily falls between the latter part of November and the first part of January of each year. A menorah is a nine-pronged candelabra representing the eight days of Chanukah, with one space for a candle used to light the other eight. "According to Jewish tradition, on the 25th of Kislev in 164 B.C.E. (before the common era), the Maccabees rededicated the Temple of Jerusalem after recapturing it." Allegheny, 109 S.Ct. at 3095. Chanukah commemorates this event. Each Chanukah the menorah is lit to celebrate the miracle of a continuously burning light; as the Court explained in Allegheny, "[w]hen the Maccabees rededicated the Temple, they had only enough oil to last for one day. But ... the oil miraculously lasted for eight days (the length of time it took to obtain additional oil)." 109 S.Ct. at 3095. In a letter requesting permission to erect the menorah, the Vermont Lubavitch group described Chanukah as "the festival of lights," and noted that, "[w]e are celebrating the miracle of a small amount of oil lasting eight days." The plain objective of the display of the menorah in City Hall Park is religious.
 
 
 9
 In December 1986, the Lubavitch group requested permission to erect a menorah in the Park during the celebration of Chanukah. Permission was granted, and the menorah was erected on December 26, 1986 and maintained through January 6, 1987. The menorah, 16 feet high and 12 feet wide, bore a sign, facing only one of the streets forming the Park's boundary. The sign stated "Happy Chanukah" and that the menorah was "Sponsored by: Lubavitch of Vermont." On December 28, 1986, the menorah was lit in City Hall Park in a ceremony attended by over 100 people, held in accordance with the religious customs of Chanukah.
 
 
 10
 In December 1987, the Vermont Lubavitch group again sought and received a permit, which allowed it to use the "South Lawn Area" of City Hall Park for a "Religious Exhibit--Menorah." The menorah was again erected on December 15 and maintained through December 23, 1987. On December 20, it was lit as in the preceding year. In June 1988, this suit was brought to prevent further permits for the same purpose.[3]
 
 
 11
 When erected in late 1987, the menorah received widespread press attention, including an article and a photograph in the New York Times of Rabbi Raskin lighting the first candle, with City Hall as a backdrop. The article pointed out that the Lubavitch group had been raising the menorah in the park for four years, but had attracted little attention the first two years because the menorah was up for only one day. The article also noted that Burlington's grant of the permit in December 1987 came only one week after a federal magistrate recommended that a cross be removed from the top of a Christmas tree located on the front lawn of a courthouse in nearby Hyde Park, Vermont, because the presence of the cross violated the Establishment Clause.[4] The menorah became a subject of controversy, the Burlington City Attorney suggested, as a result of the "heightened awareness" of religious symbolism caused by the dispute over the Hyde Park cross.
 
 
 12
 The three plaintiffs in this action are residents of the area who have been exposed to the menorah in the course of their daily activities. Each believes deeply in the principle of separation of church and state, and claims to have suffered mental anguish when confronted with this alleged violation of that principle. Plaintiff Glazier offered the grounds of the synagogue where he officiates, which is private property, as a site for the display of the menorah. The synagogue is located on a heavily traveled highway. Plaintiff Senghas made a similar offer regarding the front lawn of the Unitarian Church.
 
 II. Discussion
 
 13
 The Supreme Court decisions dealing with the vexing question of separation of church and state have been the occasion for the spending of much ink in the opinions themselves and in the inevitable commentary they have evoked. However, in view of the Court's recent decision in Allegheny, we do not think it necessary or even appropriate to engage in a lengthy discussion of the Court's many decisions in this area. As already indicated, we believe that Allegheny, which was decided after the district court in this case issued its opinion, requires us to reverse the district court.
 
 
 14
 We are aware that appellees would have a much stronger case were it not for Allegheny, because of our own court's decision five years ago in McCreary. Indeed, appellees argue that despite Allegheny, McCreary governs here. In that decision, a panel of this court, relying on the then-recently decided case of Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), held that the Village of Scarsdale had to allow a group of private citizens to display a creche, which was to be placed in the center of the business district in a Scarsdale park, a traditional public forum, during the Christmas holiday season. As indicated above, see note 1 supra, the panel's decision was affirmed by an equally divided Supreme Court. However, for reasons set forth below, we believe that McCreary is not dispositive here.
 
 
 15
 In Allegheny, the Supreme Court held that a creche in a courthouse in Pittsburgh was not permissible, but a menorah in front of a nearby government office building was. The reasoning that led to this apparently disparate result is instructive. Prior to Allegheny, as indicated above, the Court had decided Lynch v. Donnelly. In that case, the Court by a 5-4 vote had rejected the argument that the display of a publicly-financed creche, in a private park in a downtown shopping district in Pawtucket, Rhode Island, was an endorsement of the Christian religion and, therefore, a violation of the Establishment Clause. The creche was part of a larger display, which included, among other things, such traditional figures and decorations as "a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree [and] carolers." Lynch, 465 U.S. at 671, 104 S.Ct. at 1358. The Court's majority opinion by Chief Justice Burger relied heavily on the context of the display as part of the Christmas holiday season. Id. at 679, 104 S.Ct. at 1362.
 
 
 16
 Five years later, Allegheny posed the issue of two displays on public property in downtown Pittsburgh--one of a creche standing alone and the other of a menorah next to a Christmas tree. The Court divided sharply on the issues thus raised. There were five separate opinions, joined in whole or in part by various members of the Court.
 
 
 17
 As we understand those opinions, three members of the Court (Justices Brennan, Marshall and Stevens) would not allow, or would create a strong presumption against, the publicly supported display of obviously religious symbols; they, therefore, held unconstitutional the display of both the creche and the menorah in Allegheny. Two members of the Court (Justices Blackmun and O'Connor) would regard the physical context of the display as most significant; in Allegheny, the display of the creche standing alone within a courthouse was improper, but the display of the menorah, outside a government building a block away "next to a Christmas tree and a sign saluting liberty," id. 109 S.Ct. at 3112, was not. Four members of the Court (Chief Justice Rehnquist and Justices White, Scalia and Kennedy) would allow display of a religious symbol so long as it did not "represent an effort to proselytize," id. at 3139; they believed that display of neither the creche nor the menorah was such an "effort" and therefore should have been allowed.
 
 
 18
 This variety of views resulted in shifting majorities. With regard to the holding that the creche, standing alone, violated the Establishment Clause, one portion of Justice Blackmun's opinion represented the majority of himself and Justices Brennan, Marshall, Stevens and O'Connor. With regard to the holding that allowed the display of the menorah, a majority of Chief Justice Rehnquist, and Justices White, Blackmun, O'Connor, Scalia and Kennedy agreed on the result reached in another portion of Justice Blackmun's opinion, but not its rationale.
 
 
 19
 As we see it, Allegheny teaches that the display of a menorah on government property in this case conveys a message of government endorsement of religion in violation of the Establishment Clause. We reach that result for the following reasons. As already indicated, three Justices believe that any display of a religious symbol on public property should be barred, or presumptively barred, and two Justices would rest their decision on the physical context of the display. The facts here with regard to the menorah are very much like those in Allegheny with regard to the creche. The menorah, like the creche in that case, is displayed alone on public property closely associated with a core government function. In Allegheny, the creche was inside the County Courthouse; here, the menorah is right in front of City Hall--the very phrase "is commonly used as a metaphor for government." American Jewish Congress v. City of Chicago, 827 F.2d 120, 128 (7th Cir.1987). Indeed, the two members of the Court in Allegheny who engaged in intensive fact-specific analysis indicated that a menorah standing alone would be improper. See Allegheny, 109 S.Ct. at 3113 n. 64 ("The display of a menorah alone may well have [the] effect [of endorsing Judaism]....") (Blackmun, J.); id. at 3123 ("A menorah standing alone at city hall might well send such a message [of endorsement] to nonadherents [of Judaism].") (O'Connor, J.).
 
 
 20
 The menorah, like the creche, is clearly a religious symbol. All of the Justices in Allegheny agreed upon that, although some apparently believed that the menorah is also a symbol of a religious holiday that over time has acquired a secular component. Although there may be many--Jews and non-Jews--who would disagree with the apparent suggestion that a menorah itself has significant secular import, or that December is the significant holiday season for Judaism, we do not regard that as an important factor here. The parties in this case have stipulated that the menorah is a religious symbol "recognized as such by the general public," and the menorah here, unlike the menorah in Allegheny, was displayed alone so that there was nothing to indicate that the thrust of its message was secular rather than religious.
 
 
 21
 Appellees argue that there is an implied City disclaimer of sponsorship of the menorah here because it bears the legend that the display is sponsored by the Lubavitch group. However, the creche in Allegheny bore "a plaque stating: 'This Display Donated by the Holy Name Society,' " id. 109 S.Ct. at 3094, but that did not alter the result there. Id. at 3104.[5] Moreover, the facts here regarding the religious thrust of the Lubavitch message are, if anything, apparently stronger than in Allegheny. In two successive years the menorah candles were lit in a religious ceremony in the Park attended by many people. While there was "some evidence" that this also occurred in Allegheny, Justice Blackmun (part of the six-person majority allowing the menorah display) refused to consider that factor because, among other reasons, the court of appeals had not. Id. at 3115 n. 70. In contrast, we do consider the religious ceremony and regard it as quite significant.
 
 
 22
 In one respect, however, the facts in this case differ from Allegheny and thus arguably suggest a different result. Unlike the County Courthouse, where the creche in that case was located, see Allegheny, id. at 3104 n. 50, City Hall Park is indisputably a traditional public forum. Appellees argue that the Lubavitch have an absolute constitutional right to engage in symbolic expressive conduct in a public forum such as City Hall Park, limited only by narrow time, place and manner regulations. If this were so, however, the public forum doctrine would swallow up the Establishment Clause. That this is not so is clear, since the existence of a public forum began, rather than ended, the Supreme Court's analysis in Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), upon which the Lubavitch group relies heavily in its amicus brief. In that case, the Court considered whether a state university that made its facilities generally available for the activities of registered student groups could close the facilities to such groups desiring to use the facilities for religious worship and religious discussion. The Court held that the university, "[h]aving created a forum generally open to student groups," could not now "seek[ ] to enforce a content-based exclusion of religious speech." Id., 454 U.S. at 277, 102 S.Ct. at 278. We believe that the present case is distinguishable from Widmar, since the City, prior to the grant of the permits for the display of the menorah, had not created a forum in City Hall Park open to the unattended, solitary display of religious symbols. Other than the menorah in question, no permits had been issued for the unattended display of any religious symbol in the Park.
 
 
 23
 Moreover, even if the City, by granting permits in the past for uses suggesting religious activity, may be deemed to have created a forum open to religious symbols, its grant of a permit in this case would nevertheless violate the Establishment Clause. The existence of a public forum is simply a factor to be taken into account in determining whether the context of the display suggests government endorsement. See Widmar, 454 U.S. at 273-75, 102 S.Ct. at 276-77. Here, unlike in McCreary, the park involved is not any city park, but rather City Hall Park. This Park is bounded on the east by City Hall, the seat and the official symbol of Burlington city government. During the years in issue, 1986 and 1987, the menorah was located only some 60 feet away from the westerly steps of City Hall; from the general direction of the westerly public street, the menorah appeared superimposed upon City Hall. In light of these facts, "[n]o viewer could reasonably think that it occupies this location without the support and approval of the government." Allegheny, 109 S.Ct. at 3104. It is true that the district court reached a different conclusion in this respect, but we believe that it was mistaken as a matter of law. See Lynch, 465 U.S. at 693-94, 104 S.Ct. at 1369-70 (O'Connor, J., concurring) ("But whether a government activity communicates endorsement of religion is not a question of simple historical fact.... [T]he question is ... in large part a legal question to be answered on the basis of judicial interpretation of social facts.").
 
 
 24
 Thus, here, unlike in Widmar, the City's equal-access policy is incompatible with the Establishment Clause. Central to the Court's conclusion in Widmar that an equal-access policy on the part of the university would not violate the Establishment Clause was the factor that "an open forum in a public university does not confer any imprimatur of state approval on religious sects or practices," any more than such a policy confers approval on such eligible groups as the " 'Students for a Democratic Society [or] the Young Socialist Alliance.' " 454 U.S. at 274, 102 S.Ct. at 276 (citation omitted). The same cannot be said of the City's permission to display an unattended, solitary religious symbol in City Hall Park, given that Park's close association with the seat of city government, as underscored by the City's need to call a press conference disavowing City responsibility for the menorah. Indeed, the City Attorney acknowledged that "last year we had to say that [the menorah was not sponsored by the City] so often that it became ours in some people's minds." Thus, while previous, apparently noncontroversial, uses of the Park suggesting religious activity could be clearly tied to a speaker, the display of this unattended, solitary, semi-permanent symbol could not; and in the absence of a live speaker to whom responsibility could be attributed, the City was perceived as fulfilling the role of sponsor.
 
 
 25
 Finally, a prohibition on the display of unattended, solitary religious symbols would not run afoul of the constitutional requirement that "content-based exclusions" be "necessary to serve a compelling state interest" and be "narrowly drawn to achieve that end." Widmar, 454 U.S. at 270, 102 S.Ct. at 274. Observance of the constitutional mandate of the Establishment Clause may properly be characterized as a compelling governmental interest, see id. at 271, 102 S.Ct. at 275, and a prohibition limited to displays of unattended, solitary religious symbols on public property would be narrowly tailored to serve that end, since it would allow the continued use of City Hall Park for all other uses.
 
 
 26
 In short, we believe that if the unattended, solitary display of a creche in Allegheny was impermissible on the facts of that case, the unattended, solitary display of the menorah here must also be barred.
 
 
 27
 Although we believe our result is compelled by Allegheny, we do not reach it reluctantly. While the motive of the City of Burlington in issuing the permits to the Lubavitch group was doubtless benign, even commendable, that does not dispose of the case before us. What must be considered is the effect of a semi-permanent display in the Park in front of City Hall of a concededly religious symbol. Obviously, few--if any--of the citizens of Burlington will feel threatened by the unattended, solitary display of a religious symbol of a minority faith. But, if that is allowed, it would also seem permissible to display, standing alone, a symbol of the majority faith--a creche or a cross--and this could well lead members of minority religions or nonbelievers to think that " 'adherence to a religion' " was relevant to " 'standing in the political community.' " Allegheny, 109 S.Ct. at 3101 (quoting Lynch, 465 U.S. at 687, 104 S.Ct. at 1366 (O'Connor, J., concurring)). Cf. Friedman v. Board of County Commissioners, 781 F.2d 777, 779, 781-82 (10th Cir.1985) (in banc) (official county seal bearing Latin cross and Spanish motto, translated as "With This We Conquer," prominently displayed on county vehicles and to identify law enforcement officers would have a "threatening connotation" for non-Christians), cert. denied, 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986). Moreover, the display of a minority religious symbol can be disturbing, even if not threatening, to members of the majority faith and to others. It apparently was in this case, since the record suggests that complaints arose from a perceived disparity of treatment. We believe that refusing to allow the unattended, solitary display of such emotion-laden religious symbols as a creche, a cross or a menorah on public property and encouraging the placement of them instead in places of worship and in the home will, in the long run, tend to diminish "unintended divisiveness." Allegheny, 109 S.Ct. at 3132 n. 10 (Stevens, J.).
 
 
 28
 Justice O'Connor pointed out in Allegheny that "[w]e live in a pluralistic society. Our citizens come from diverse religious traditions or adhere to no particular religious beliefs at all." 109 S.Ct. at 3119. The Constitution, as it has developed over the years through decisions of the Supreme Court, has allowed Americans of all faiths and of no faith to reach a fragile accommodation in the sensitive area of separation of church and state. Despite the obvious good intentions of the City of Burlington, that accommodation would be hindered, not helped, by grant of the permit in this case.
 
 
 29
 For the reasons set forth above, we reverse the judgment of the district court and remand for entry of judgment for plaintiffs.
 
 MESKILL, Circuit Judge, dissenting:
 
 30
 The issue presented by this appeal is whether a municipality may allow a private group to display a menorah accompanied by a sign identifying the private sponsorship of the menorah in a public park adjacent to City Hall. The resolution of this issue calls for a delicate balancing of individuals' right to religious expression with the proscription against the government's establishment of religion. Because I believe that on the facts of this case, the former prevails over the latter, I respectfully dissent.
 
 
 31
 The analysis of the menorah display must begin with the premise that the denial of permission to erect the menorah is a content-based restriction on religious expression in a public forum. Such restrictions of expression in a public forum receive especially careful judicial scrutiny. See Boos v. Barry, 485 U.S. 312, 321-22, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988). Content-based restrictions must fall before the First Amendment unless they are necessary to serve a compelling governmental interest and are narrowly drawn to achieve that interest. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983); Widmar v. Vincent, 454 U.S. 263, 270, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981). It is significant that County of Allegheny v. American Civil Liberties Union, --- U.S. ----, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), to which the majority properly looks for guidance, did not raise the issue of individual religious expression in a public forum. Id. 109 S.Ct. at 3104 n. 50; see McCreary v. Stone, 739 F.2d 716 (2d Cir.1984), aff'd by an equally divided Court sub nom. Board of Trustees of Scarsdale v. McCreary, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985).
 
 
 32
 Public parks, like streets and sidewalks, historically "have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hague v. Committee for Indus. Org., 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939); accord United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983); Hudgens v. NLRB, 424 U.S. 507, 515, 96 S.Ct. 1029, 1034, 47 L.Ed.2d 196 (1976). These places "occup[y] a special position in terms of First Amendment protection and will not lose [their] historically recognized character for the reason that [they] abut[ ] government property that has been dedicated to a use other than as a forum for public expression." Grace, 461 U.S. at 180, 103 S.Ct. at 1708.
 
 
 33
 The parties, recognizing the obvious nature of City Hall Park, agree that the park is a traditional public forum. In Widmar v. Vincent, the Supreme Court concluded that a state university, having created a public forum for student groups, could not exclude from that forum expression based on its religious content. 454 U.S. at 277, 102 S.Ct. at 278. The majority, however, raises a doubt about the import of City Hall Park's status as a public forum. Instead, it seeks to distinguish Widmar from the case now before us by concluding that the City of Burlington (City), by permitting certain prior religious uses of the park, has "not created a forum in City Hall Park open to the unattended, solitary display of religious symbols."
 
 
 34
 The majority's attempted distinction, in my view, misses the main point of Widmar. The park's status as a public forum does not depend upon whether the City has in the past permitted a particular type of speech or form of expressive conduct, as the majority suggests. City Hall Park is an acknowledged traditional public forum, a place where individuals are permitted to speak and express themselves, subject to reasonable time, place and manner restrictions. See Perry Educ. Ass'n, 460 U.S. at 45, 103 S.Ct. at 954. The proper question is whether the City may exclude from this place that historically has been held open for free expression a category of speech based on its content. The answer to that question cannot depend solely on whether the expression is attended or unattended. The answer lies in assessing whether the City, by permitting a private group to erect a menorah in a public forum, has conveyed a message of endorsement of religion in violation of the Establishment Clause.
 
 
 35
 At least as it has been displayed in City Hall Park, the menorah clearly is a religious symbol and the message of the display is a religious one. This, however, is only the beginning of the inquiry. The display of a religious symbol violates the Establishment Clause if the display conveys a message of governmental endorsement of religion. Allegheny County, 109 S.Ct. at 3100; see also Edwards v. Aguillard, 482 U.S. 578, 593, 107 S.Ct. 2573, 2583, 96 L.Ed.2d 510 (1987); School Dist. of Grand Rapids v. Ball, 473 U.S. 373, 389-92, 105 S.Ct. 3216, 3225-27, 87 L.Ed.2d 267 (1985); Stone v. Graham, 449 U.S. 39, 41-42, 101 S.Ct. 192, 193-94, 66 L.Ed.2d 199 (1980) (per curiam). Careful consideration must therefore be given to the specific factual context of the display. See Lynch v. Donnelly, 465 U.S. 668, 680, 104 S.Ct. 1355, 362, 79 L.Ed.2d 604 (1984).
 
 
 36
 It is of no small significance that the menorah displayed in City Hall Park was owned, erected, maintained, and removed by a private group with no actual contribution or support, financial or otherwise, from the City, except in the form of the issuance of a permit. See Allegheny County, 109 S.Ct. at 3097 (privately owned menorah stored, erected, and removed by city, and included in city's holiday display); Lynch, 465 U.S. at 671, 104 S.Ct. at 1358 (city-owned Christmas display, including creche, erected on private property). The City thus has not in fact sponsored or endorsed the menorah display. The only question is whether a reasonable viewer would perceive the City as endorsing the display.
 
 
 37
 The relatively short time period that the menorah was displayed also deserves note. It is not a permanent fixture in City Hall Park. Instead, it was displayed for only twelve days in 1986, and only nine days in 1987, during the holiday season of Chanukah.
 
 
 38
 Of paramount significance, however, is the location of the display in a traditional public forum. Neither the creche nor the menorah in Allegheny County was displayed in a public forum. In fact, the creche was placed inside the County Courthouse in a location where private displays were not ordinarily permitted and "[n]o viewer could reasonably think that it occupie[d the space] without the support and approval of the government." Allegheny County, 109 S.Ct. at 3104. By contrast, the menorah in City Hall Park was not overwhelmingly surrounded by the indicia of governmental authority. The only substantial connection between the menorah display and the government was the location of City Hall adjacent to the park.
 
 
 39
 The majority emphasizes this proximity of the park to and its connection with City Hall, as reflected in the park's name. In particular, the majority stresses that in 1986 and 1987, the menorah was located approximately sixty feet away from the steps of City Hall and that, when viewed from the west side of the park, the menorah was seen against the backdrop of City Hall.[1] To rest constitutional adjudication on the compass heading of the viewer trivializes the importance of the principles involved. See id. at 3144 (Kennedy, J., concurring in judgment in part, dissenting in part) (decrying the reliance on a "jurisprudence of minutiae"). Viewed from a different side of the park, the menorah would be superimposed against a bank, a restaurant, or a vacant lot. No reasonable person would suggest that the bank or the restaurant endorses the menorah simply because either one can be seen in the menorah's background.
 
 
 40
 Permitting religious speech in a public forum in and of itself "does not confer any imprimatur of state approval on religious sects or practices" any more than permitting political speech conveys governmental endorsement of a political group. Widmar, 454 U.S. at 274, 102 S.Ct. at 276. Indeed, the fact that the display is in a public forum in which a wide variety of other kinds of speech and expression takes place is a factor negating governmental endorsement of the religious message of the display. Id. at 274-75, 102 S.Ct. at 276-77. Moreover, I cannot agree that merely because City Hall is located on one side of the park, which is also surrounded by a host of sundry businesses and shops, the park loses its special status as a traditional public forum. Cf. Grace, 461 U.S. at 179-80, 103 S.Ct. at 1708-09. The record illustrates that the park has been used for a wide variety of expressive purposes, some attended and some unattended. The display of the menorah should be viewed as just part of this diverse group of uses of the park.
 
 
 41
 The majority also contends that the display of the unattended menorah, unlike other religious uses of the park in which live speakers are present to whom the religious expression can be attributed, results in the perception that the City is the sponsor of the menorah. The menorah display, however, has something that fulfills the role of the live speaker in identifying the sponsor of the display: a sign. The sign, which the district court found was visible for some distance when viewed from the west side of the park, stated that the menorah was sponsored by "Lubavitch of Vermont." We can assume that anyone who is interested in determining the sponsorship of the menorah would read the sign.
 
 
 42
 Likening the sign here to that accompanying the creche in Allegheny County, the majority maintains that the sign had no effect on the appearance of governmental endorsement of the menorah display. In Allegheny County, the creche display included a plaque stating that the display had been donated by the Holy Name Society. 109 S.Ct. at 3095. Because the creche, which was located inside the County Courthouse, was so overwhelmingly surrounded by the presence of government, the sign could not dispel the perception of the government's endorsement of the creche. Id. at 3105. Nevertheless, "[w]hile no sign can disclaim an overwhelming message of endorsement, ... an 'explanatory plaque' may confirm that in particular contexts the government's association with a religious symbol does not represent the government's sponsorship of religious beliefs." Id. at 3114-15 (citation omitted). The sign accompanying the menorah in this case adequately serves to identify the sponsor of the display and contradicts any notion of City sponsorship arising out of the location in City Hall Park. The majority nonetheless contends that the message of the menorah display is equally if not more deeply religious in content than that conveyed by the creche in Allegheny County, and that therefore the sponsorship sign should be accorded no significance. The purpose of the sign, however, is not to negate the religious message of the display; rather, it is to negate the message of governmental endorsement of the religious symbol. With the creche in Allegheny County, this was not possible because of the pervasive governmental presence at the creche's location. That pervasiveness is substantially diminished in a traditional public forum that happens to be adjacent to City Hall. The sponsorship sign, therefore, effectively negates any hint of governmental endorsement that a viewer might "perceive."
 
 
 43
 I am also unpersuaded that this conclusion should be altered because the City received complaints about the menorah display and felt compelled to respond to those complaints in a press conference. The angry objections of a handful of citizens is of little significance when considering whether the display of a religious symbol objectively conveys a message of governmental endorsement. See American Jewish Congress v. City of Chicago, 827 F.2d 120, 130 (7th Cir.1987) (Easterbrook, J., dissenting) ("It would be appalling to conduct litigation under the Establishment Clause as if it were a trademark case, with ... witnesses testifying they were offended--but would have been less so were the creche five feet closer to the jumbo candy cane."). Furthermore, I would not view the factual context of this case any differently if the City had remained entirely silent in the face of the complaints. It seems almost nonsensical to conclude that the claimed governmental endorsement of the menorah is bolstered by the City's decision to affirm publicly that it did not sponsor or have any other connection with the menorah.
 
 
 44
 The erection of a privately owned and maintained religious symbol, accompanied by a sign identifying its sponsor, for a relatively short period of time in a traditional public forum does not convey a message of governmental endorsement of religion merely because the forum is located next to City Hall. Rather, the denial of permission to display the menorah would constitute unnecessary hostility toward religion. Permitting the display does not violate the Establishment Clause; denying access to the traditional public forum, in contrast, would treat religious expression differently from other forms of protected expression without any compelling justification for doing so. See Widmar, 454 U.S. at 269 & n. 6, 102 S.Ct. at 274 & n. 6. The First Amendment does not countenance such discrimination on the basis of the content of expression.
 
 
 45
 For these reasons, I would affirm the judgment of the district court and respectfully dissent.
 
 
 
 [1]
 McCreary v. Stone, 739 F.2d 716 (2d Cir.1984), aff'd by an equally divided Court sub nom. Board of Trustees of Scarsdale v. McCreary, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985)
 
 
 [2]
 Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances
 U.S. Const. amend. I (emphasis supplied). The Establishment Clause has long been held applicable to the States. See Wallace v. Jaffree, 472 U.S. 38, 42 n. 10, 48-55, 105 S.Ct. 2479, 2482 n. 10, 2485-89, 86 L.Ed.2d 29 (1985).
 
 
 [3]
 In November 1988, the City again granted permission for the display of the menorah, this time in a different part of City Hall Park. Since the Park encompasses less than a city block, we do not regard the change as significant. In any event, this appeal concerns the placement of the menorah during the 1986 and 1987 seasons, which the district court found permissible. Moreover, as a result of the district court's decision, the City is free to return the menorah to its original location
 
 
 [4]
 See White v. Village of Hyde Park, Civ. No. 87-259 (D.Vt. Dec. 10, 1987) (Magistrate's report and recommendation). Subsequently, the parties settled the litigation. As part of the settlement, the Trustees of Hyde Park agreed to no longer place any cross on the Hyde Park Court House lawn. Judge James S. Holden of the district court thereafter approved the stipulation of dismissal, in a written order. White v. Village of Hyde Park, Civ. No. 87-259 (D.Vt. Sept. 14, 1988)
 
 
 [5]
 Even if this display had been accompanied by an express disclaimer of City sponsorship and approval, the pervasive message of government endorsement communicated by this context would not be negated. City Hall is closely identified with this particular city park, as its very name and proximity to the seat of municipal authority suggest. In these circumstances, " 'a disclaimer of the obvious is of no significant effect.' " American Jewish Congress, 827 F.2d at 128 (citation omitted)
 
 
 [1]
 In 1988, the City required that the menorah be placed in the northeast quadrant of the park, so that when viewed from the west side of the park it would be seen with the Merchants Bank building in the background