Robert and Susan **JOKI**, Plaintiffs,

v.

**BOARD OF EDUCATION OF the SCHUYLERVILLE CENTRAL SCHOOL DISTRICT, NEW YORK, a Governmental Body of the State of New York; and Peter M. Brenner, Sr. as Superintendent of Schools of the Schuylerville Central School District, Defendants.**

No. 89–CV–1130.

United States District Court, N.D. New York.

Aug. 27, 1990.

Whiteman, Osterman & Hanna, Albany, N.Y., for plaintiffs; Scott Fein, of counsel.

Clayman, Mead & Gallo, Schenectady, N.Y., for defendants; Kathryn McCary, of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, District Judge.

Plaintiffs Robert and Susan Joki commenced this action on September 19, 1989. Plaintiffs seek to permanently enjoin defendants from displaying a particular painting in the Schuylerville High School auditorium. Presently before the court is plaintiffs' motion for summary judgment.

## BACKGROUND

Plaintiffs Robert and Susan Joki, after attending a function in Schuylerville High School's auditorium in April 1988, contacted defendant Peter M. Brenner, Superintendent of Schools of the Schuylerville Central School District, regarding what they felt to be "an inappropriate display of a religious painting in a public high school." [1] At that time, they requested that the school remove the painting. The school, however, refused to acquiesce to plaintiffs' request believing that the painting was merely student art and served as an example of what high school students were capable of doing. As a result of plaintiffs' repeated efforts to have the painting removed, defendant Board of Education held an executive session on June 9, 1989 at which time it decided to continue displaying the painting.

The art work in question was donated to the school in 1965 by Craig Martin, then a senior student at Schuylerville High School. The school permitted Martin to paint the picture directly onto masonite secured to the inside left wall of the school's main auditorium as part of a plan to have students decorate the school with original art work. The school initiated this program in the early 1960's to provide senior students, planning careers in art, with the opportunity to create original works from original themes without interference from supervision. Tracy Affidavit, Doc. 10 at ¶ 8. This program, however, lasted only seven years until the departure of Thomas Tracy, then the art teacher at Schuylerville High School.

The painting itself is ten feet by twelve feet. *See* Robert Joki ("Robert") Affidavit, Docket 7 at ¶ 12; Exhibit D to Susan Joki ("Susan") Affidavit, Doc. 7. Two spotlights face the painting, although neither works at this time. Exhibit D to Susan Affidavit, Doc. 7. The only other notable objects located in the auditorium are an American Flag and two pictures, all smaller than the painting in issue and located on different walls.[2] *See* Susan Affidavit, Doc. 7 at ¶ 8. While untitled, the painting contains a variety of figures engaged in a variety of activities.

The central figure in the painting portrays a man nailed to a wooden cross. Exhibit A to Susan Affidavit. This figure is bleeding from the left side of his chest. *Id.* at Exhibit C. Across his forehead are two

---

1. Plaintiff Susan Joki is a practicing member of the Jewish faith, Affidavit of Susan Joki ("Susan"), Docket ("Doc.") 7 at ¶ 13, while her husband, plaintiff Robert Joki, received religious training in a Baptist Church. Affidavit of Robert Joki, Doc. 7 at ¶ 6. They are raising their children in the Jewish faith. Susan Affidavit, Doc. 7 at ¶ 13.

2. Of the other two paintings located in the auditorium, only the picture depicting an audience was created by a Schuylerville student. The other, of George Washington, was done professionally.

intertwined white lines containing red high-lighting which appears to be a crown of thorns. *Id.* Further, a shell burst of yellow light surrounds the cross upon which the central figure is hanging. *Id.* at Exhibit B. Other figures in the painting include two other men nailed to crosses, a man tossing a net into the water, a woman mourning, two men fighting and a man carrying two engraved stone tablets. *Id.* at Exhibit A. The man carrying the tablets has a long gray beard and is situated directly to the left of the central cross. *Id.* The tablets have the Roman numerals I through X inscribed on them. *Id.* at Exhibit C.

Plaintiffs claim the central figure depicts the scene of the Crucifixion of Jesus Christ and supports this claim by supplying the affidavits of several clergy members. *See, e.g.,* Borden Affidavit, Doc. 7 at ¶ 8. Defendants, on the other hand, claim that the painting represents various examples of "man's inhumanity to man" rather than having any religious significance. Tracy Affidavit, Doc. 10 at ¶ 9. In support of this contention, defendants supply the affidavits of two of Martin's classmates stating that they are familiar with the alleged theme of the painting and that the painting in no way provokes religious thoughts. Reynolds Affidavit, Doc. 10 at ¶ 20 [3]; Forbes Affidavit, Doc. 10 at ¶ 21.

## DISCUSSION

Before addressing any particular argument plaintiffs raise, the court will briefly review the burdens as assigned on a motion for summary judgment. In order to grant plaintiffs' motion, the court must find that "there is no genuine issue of material fact and that the [plaintiffs are] entitled to judgment as a matter of law." *Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987). The burden rests on the moving party to demonstrate the lack of a genuine issue of fact, *id.,* while the non-moving party need only establish a basis for a jury to find in its favor. *Sussex Leasing Corp. v. US West Financial Services, Inc.,* 877 F.2d 200, 202 (2d Cir.1989).

■ This case involves a question concerning the separation of church and state. The first amendment to the Constitution prohibits Congress from making laws "respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Although several recent Supreme Court decisions analyze the establishment clause, this area of the law is anything but settled. In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Court held that a state practice which touches upon religion is permissible only if it has a secular purpose, neither advances nor inhibits religion in principal or primary effect and does not foster excessive entanglement with religion. *Id.* at 612–613, 91 S.Ct. at 2111–12. The Court seemed to depart from the *Lemon* approach in *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), where the Court focused primarily upon the context of the state practice. *Id.* at 679, 104 S.Ct. at 1362. However, in *County of Allegheny v. ACLU,* —— U.S. ——, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), the Court appeared to return to the *Lemon* three-step analysis. *See id.* 109 S.Ct. at 3100.

For purposes of plaintiffs' motion for summary judgment, plaintiffs style their argument in terms of the "effects" prong of the *Lemon* test [4] as follows: The painting conveys a religious message. Defendants' display of the painting has the effect of placing the imprimatur of state authority upon that religious message. Thus, the defendants' display of the painting runs contrary to the establishment clause of the first amendment to the United States Constitution.

While difficult to interpret and replete with concurring and dissenting opinions,

---

3. Of note, Susan Reynolds states that she is a practicing Christian of very deep faith. Reynolds Affidavit, Doc. 10 at ¶ 19.

4. Although defendants briefed the first and third prong of the *Lemon* test, the court reaches no conclusion with regard to those arguments.

*Allegheny* stands as the Court's latest attempt to interpret the "effects" element of the *Lemon* inquiry. *Id.* at 3101 n. 45 (opinion of Blackmun, J.). In *Allegheny*, the Court examined two displays on public property in downtown Pittsburgh—one of a creche standing alone in a courthouse staircase and the other of a menorah displayed as part of a larger winter holiday exhibit in front of the City–County Building.[5] A sharply divided Court issued five separate opinions joined in whole or in part by various Members of the Court. Indeed, gleaning an understanding of the *Allegheny* decision is further complicated by the fact that the two holdings in the case resulted from shifting Court majorities.

When analyzing the decisions of a fragmented Supreme Court in which no single decisional rationale gained the approval of five Justices, the Supreme Court instructs lower federal courts to view the Court's holding " 'as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976)). In *Allegheny,* several portions of Justice Blackmun's opinion obtained a majority of the Court. Of course, those portions where Justice Blackmun spoke for the majority must be followed by this court. Moreover, for reasons more fully illustrated below, this court will generally follow the approaches taken by Justices Blackmun and O'Connor as their positions, which are similar although somewhat different, best fulfill the criteria of constituting the positions "taken by those Members who concurred in the judgments on the narrowest grounds."

The *Allegheny* Court arrived at two results. On one hand, the *Allegheny* Court found the display of the creche impermissible. *Id.* 109 S.Ct. at 3105. Here, Justice Blackmun's opinion represented the majority of the Court. *Id.* (opinion of the Court written by Blackmun, J., in which Justices Brennan, Marshall, O'Connor and Stevens joined). In banning the display of the creche, the Court engaged in a fact-specific analysis while construing the establishment clause as prohibiting those displays which have the effect of endorsing religion. *Id.; see id.* at 3118 (O'Connor, J., concurring in part and concurring in the judgment) ("every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion").[6]

On the other hand, the Court found the display of the menorah permissible. *Id.* at 3115–3116. Six Members agreed on this result but not on its rationale. *Id.* at 3115 (opinion of Blackmun, J.); *see id.* at 3122 (O'Connor, J., concurring in part and concurring in the judgment); *see also id.* at 3134 (Kennedy, J., concurring in the judgment in part and dissenting in part in which the Chief Justice and Justices White and Scalia join). As will be explained in greater detail below, Justices Blackmun and O'Connor, with respect to the menorah, reiterated their positions regarding the establishment clause. In permitting the display, Justice Blackmun focused upon the secularizing effect of the Christmas tree and the winter-holiday season, *id.* at 3113 (opinion of Blackmun, J.), while Justice O'Connor concentrated on the presence of the tree and

---

5. The creche used words along with the portrayal of the nativity scene to make its religious message even more forceful. The angel in the creche said, "Glory to God in the Highest," presumably because of the birth of Christ. *Allegheny,* 109 S.Ct. at 3103. The menorah, on the other hand, commemorates the celebration of the miracle of lights. It is a visual symbol used to celebrate Chanukah. As with the Christmas tree, it has both secular and religious dimensions. *Id.* at 3112 (opinion of Blackmun, J.).

6. Three Justices, though agreeing with Justice Blackmun's rationale with regard to the creche,

concurred on broader grounds. *See id.* at 3124 (Brennan, J., concurring in part and dissenting in part in which Justices Marshall and Stevens join); *see also id.* at 3133 (Stevens, J., concurring in part and dissenting in part in which Justices Brennan and Marshall join). In applying the "effects" test, these Members advocate the position that the Establishment Clause should be "construed to create a strong presumption against the display of religious symbols on public property." *Id.* at 3131 (Stevens, J., concurring in part and dissenting in part).

the sign saluting liberty as negating any endorsement of religion. *Id.* at 3122 (O'Connor, J., concurring in part and concurring in the judgment). However, four Members concurred in this judgment on broader grounds by construing the establishment clause as only banning those displays which represent an effort to proselytize. *Id.* at 3134 (Kennedy, J., concurring in the judgment in part and dissenting in part).

The Second Circuit has recently engaged in an analysis of *Allegheny. See Kaplan v. City of Burlington,* 891 F.2d 1024 (2d Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 2619, 110 L.Ed.2d 640 (1990). In *Kaplan,* the Second Circuit was faced with the issue of whether the display of a menorah, standing alone in a city hall park, violated the establishment clause. *Id.* at 1028. In order to reach a decision on the constitutionality of the menorah, the Second Circuit set forth its understanding of the opinions in *Allegheny:*

> [T]hree members of the Court (Justices Brennan, Marshall and Stevens) would not allow, or would create a strong presumption against, the publicly supported display of obviously religious symbols; ... Two members of the Court (Justices Blackmun and O'Connor) would regard the physical context of the display as most significant; ... Four members of the Court (Chief Justice Rehnquist and Justices White, Scalia and Kennedy) would allow display of a religious symbol so long as it did not represent an effort to proselytize....

*Kaplan,* 891 F.2d at 1028. Ultimately, the Second Circuit focused upon the analyses of Justices Blackmun and O'Connor in holding that the display of the menorah conveyed a message of government endorsement of Judaism. *Id.* at 1028–1030.

With regard to the constitutionality of Martin's painting, this court, in keeping with *Marks* and *Kaplan,* will focus on the rationales set forth in Justice Blackmun's and Justice O'Connor's opinions in *Allegheny.* While engaging in fact-specific analyses, they interpret the establishment clause as banning those displays which have the effect of endorsing religion. *See County of Allegheny,* 109 S.Ct. at 3103 (opinion of Blackmun, J.); *School District of Grand Rapids v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985); *see also Board of Education v. Mergens,* — U.S. —, 110 S.Ct. 2356, 2372–73, 110 L.Ed.2d 191 (1990) (plurality opinion); *Kaplan,* 891 F.2d at 1028. Whether the operative word is "effect" as used in *Lemon* or "endorsement," the underlying principle remains the same. *County of Allegheny* 109 S.Ct. at 3101. At the very least, the establishment clause prohibits the government from appearing to take a position on questions of religious belief. *Id.; Lynch v. Donnelly,* 465 U.S. 668, 687, 104 S.Ct. 1355, 1366, 79 L.Ed.2d 604 (1983) (O'Connor, J., concurring). Accordingly, when evaluating the effect of defendants display in this instance, the court must determine whether, taking into account the content and context of the painting, a reasonable observer would likely perceive the government action as an endorsement of Christianity. *See County of Allegheny,* 109 S.Ct. at 3102 (opinion of Blackmun, J.); *see id.* at 3123 (O'Connor, J., concurring in part and concurring in the judgment); *see also Foremaster v. City of St. George,* 882 F.2d 1485, 1491 (10th Cir.1989) (finding issue of material fact with regard to what an average observer would perceive when viewing the City logo), *cert. denied,* — U.S. —, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).

Here, defendants display a painting in a high school auditorium. The figures contained in the painting range from three men being crucified to a man casting a net over water. *See* Exhibit A to Susan Affidavit. Plaintiffs contend that the central figure in the painting depicts the Crucifixion of Jesus Christ and is an "obvious religious symbol." *See* Susan Affidavit, Doc. 7 at ¶ 7. In support of this contention, plaintiffs offer the affidavits of several clergy members and one art history professor indicating several features of the painting identical to the Crucifixion scene as depicted in the Holy Bible. *See generally,* Minister De Velder Affidavit, Rabbi Alpern Affidavit, Reverend Borden Affidavit,

and Professor Kettlewell Affidavit, Doc. 7.[7] Specifically, these features include a man, wearing a crown of thorns and bleeding from the left side of his chest, who is nailed to a cross and flanked on either side by two other men nailed to crosses. Plaintiffs cite: *Matthew* 27:29, 31; *Mark* 15:17, 27; and, *John* 19:34 to support their contention that this individual is Jesus Christ at his crucifixion. Further, plaintiffs argue that the shell burst of light surrounding the central figure removes the portrayed event from merely an earthly context. Kettlewell Affidavit, Doc. 7 at ¶ 13.

Moreover, plaintiffs assert that the presence of four other identifiable religious figures in the painting bolsters plaintiffs' position that the central figure is indeed a scene depicting the Crucifixion. Specifically, plaintiffs argue that the man tossing the net represents Peter the Fisherman, the woman mourning represents either Mary Magdalene or Mary Mother of Christ, the man carrying the stone tablets represents Moses and the figure immersed in water represents John the Baptist. *See, e.g.,* Borden Affidavit, Doc. 7 at ¶ 9. Plaintiffs do not attempt to identify the religious significance of the remaining figures in the painting.[8] However, plaintiffs do contend that other figures, such as the two men fighting, serve to set the time frame identical to the historical time of the Crucifixion of Christ. Kettlewell Affidavit, Doc. 7 at ¶ 14. Specifically, plaintiffs' expert argues that these two figures are Roman gladiators, circa the time of the Crucifixion of Jesus Christ. *Id.* Finally, plaintiffs· contend that since the children viewing this painting are at an impressionable age, in-

cluding two of her own aged five and six, the religious effect is far greater than it would be were the painting located elsewhere and viewed by a more mature audience. Susan Affidavit, Doc. 7 at ¶¶ 4 and 13; *See also* Scherer Affidavit, Doc. 7 at ¶¶ 13–23.

Defendants advance two principal arguments in opposition to plaintiffs' motion for summary judgment. First, defendants submit that the painting is merely "community art work" and in no way provokes religious reflections, even to devout Christians. Reynolds Affidavit, Doc. 10 at ¶ 20; *see* Forbes Affidavit, Doc. 10 at ¶ 21. Rather, defendants argue that the central figure merely serves as a particularly appropriate example of "man's inhumanity to man" consistent with the alleged theme of the artist.[9] Moreover, defendants contend that the other figures plaintiffs purport to identify are similarly non-religious. *Id.* Second, defendants argue that, even if the purported figures are religious, the display in this instance contains certain features which neutralize the religious effect and negate any government endorsement of a religious message.

With respect to defendants' argument that the painting does not portray any religious symbols, neither party disputes the fact that the central figure in the painting depicts, at least, a man nailed to a Latin cross, i.e., a crucifixion. *See* Exhibit B to Susan Affidavit, Doc. 7.; *see also* Defendants' Memorandum of Law, Doc. 12 at 3. Notwithstanding defendants' contentions, the Latin cross symbolizes central Christian themes and represents the key Chris-

---

7. Joyce B. De Velder is an ordained Minister in the Reformed Church in America serving as Pastor in Schuylerville. Rabbi Laurence Aryeh Alpern is an ordained Rabbi at the Congregation Shaarei Tfillah in Saratoga Springs, New York. Reverend Jane Borden is an ordained Minister in the United Methodist Church holding the position of Pastor in Saratoga Springs. James K. Kettlewell is an Associate Professor of the History of Art at Skidmore College in Saratoga Springs.

8. While the painting contains a total of twenty-one human figures, plaintiffs only attempt to identify seven of them by name.

9. One manner by which the plaintiffs counter this assertion is by reference to the 1966 Schuylerville High School Yearbook. It contains a reproduction of the painting along with a brief explanation. Exhibit B to Robert Joki Affidavit, Doc. 7; *see id.* at ¶ 10. The Yearbook entitled the painting "The Mural of the Crucifixion" and in its explanation of the painting quotes Isaiah 53:3: "He was despised and rejected of men; a man of sorrows, and acquainted with grief." *Id.* Prior to this quotation, the explanation states, "[t]he painting represents the physical and spiritual nature of man. Everyone makes his own decision as to exactly what it depicts." *Id.*

tian concept of the Crucifixion. *Allegheny*, 109 S.Ct. at 3137 (Kennedy, J., concurring in judgment in part and dissenting in part) (the year round display of a large Latin cross violates the establishment clause); *ACLU v. City of St. Charles*, 794 F.2d 265, 271 (7th Cir.1986) (the cross "is indeed the principal symbol of Christianity as practiced in this country today"), *cert. denied*, 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986); *Hewitt v. Joyner*, 705 F.Supp. 1443, 1449 (C.D.Cal.1989) (the Latin cross represents the key Christian concept of the Crucifixion). Moreover, the central figure in the painting bears a remarkable resemblance to the crucified Jesus as depicted in the Holy Bible. *See* Matthew 27:29 (Revised Standard Version ("RSV")) ("and plaiting a crown of thorns, they put it on his head"); Mark 15:27 (RSV) ("and with him they crucified two robbers, one on his right and one on his left"); John 19:34 (RSV) ("one of the soldiers pierced his side with a spear").

In addition to presenting affirmative evidence that Martin's painting depicts the Crucifixion, plaintiffs challenged defendants to come forward with colorable evidence disputing the fact that an average observer would perceive the Crucifixion of Jesus Christ when viewing the painting. Defendants' suggestions, that the artist painted this crucifixion with no specific historical incidence in mind and that the crucifixion is merely congruous with the artist's alleged theme of "man's inhumanity to man," are insufficient to withstand their burden on summary judgment. Although two of the artist's classmates and his teacher view the painting as only representing "man's inhumanity to man," *see, e.g.*, Forbes Affidavit, Doc. 10 at ¶ 12, these facts do not raise a material issue of fact. Their views stem from interaction with the artist, and hence, they are not the views of average observers. Tracy Affidavit, Doc. 10 at ¶ 16; Reynolds Affidavit, Doc. 10 at ¶ 16; Forbes Affidavit, Doc. 10 at ¶¶ 11, 12. The school displays the painting with nothing to explain its significance or meaning. The court cannot impute complete knowledge of the artist's theme to the average observer of the painting. *See Harris v.*

*City of Zion*, 729 F.Supp. 1242, 1250 (N.D. Ill.1990) (refusing to impute knowledge of the city's history to the average observer in declaring unconstitutional the city's seal displaying the cross). The court, therefore, finds that an average observer would perceive the central figure in Martin's painting to represent the Crucifixion of Jesus Christ.

Were this a case of the Crucifixion standing alone, the inquiry would end here. There is abundant case law holding unconstitutional the prominent display of a cross without any detracting features. *See, e.g., City of St. Charles*, 794 F.2d 265 (holding impermissible the prominent display of a cross on a public building); *see also Friedman v. Bd. of County Comm'rs of Bernalillo*, 781 F.2d 777, 782 (10th Cir.1985) (the presence of a Latin cross in a city logo violates the establishment clause), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986); *cf. Kaplan v. City of Burlington*, 891 F.2d 1024 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 2619, 110 L.Ed.2d 640 (1990) (declaring unconstitutional a city display of a menorah standing alone during Chanukah). However, this is not such a case.

■ As noted above, defendants further argue that, even if the identified figures are whom plaintiff maintains them to be, the presence of unidentifiable secular characters and the context in which the school displays the painting negate any message of government endorsement of Christianity and neutralize the effect of the Crucifixion. Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment, Doc. 12 at 20. This poses a much closer constitutional question. However, it is one which remains appropriate for resolution on summary judgment. In the instant case, the court has before it the undisputed context in which the painting appears. *See Harris*, 729 F.Supp. at 1248 (considering only the context in which the religious symbol appeared). The question of whether the display constitutes government endorsement of Christianity is a question of law. *See Lynch*, 465 U.S. at 694, 104 S.Ct. at 1370 (O'Connor, J., concurring)

(whether a government activity communicates an endorsement of religion is in large part a question of law).

Defendants indicate several contextual features of the painting that might negate any government endorsement of a religious message. First, defendants contend that the religious effect is reduced since the painting is technically "not great art" and located in a poorly lit corner of the auditorium. *See* Reynolds Affidavit at ¶¶ 18 and 22. These claims are simply without merit. Even—or especially—from a distance, the central figure of the painting is clear to the average observer, without regard to the quality of the art work and without regard to the lighting. Exhibit D to Susan Affidavit, Doc. 7. From viewing plaintiffs' exhibits, the area of the auditorium in which the school displays the painting is not poorly lit. *Id.* Further, the shell burst of yellow light behind the central cross focuses one's attention directly on that figure. Finally, as indicated, there are two spotlights directed at the painting which are not consistent with the remainder of the auditorium's lighting system. *Id.* Although neither works, their presence could reasonably be construed to indicate the school's desire to draw attention to the painting. In short, the quality of the painting and its location are features which do not negate endorsement of the religious message.

Second, defendants maintain that the neighboring relationship of the American Flag and the picture of the Revolutionary War scene further negate endorsement or neutralize the effect of the Crucifixion. Here, the school displays the painting permanently on a side wall of the auditorium. The Flag and the other picture are displayed on the front wall. These two objects are too far removed from the display of Martin's painting and are dwarfed in size by comparison. These features neither negate endorsement nor neutralize the effect of the painting.

Finally, defendants contend that the presence of the clearly unidentifiable religious figures neutralize any religious effect of the painting. Taken in isolation, the figures other than the Crucifixion are difficult to identify, even to the trained observer. *Supra* note 8. Considering the evidence in the light most favorable to defendants, the court concludes that an average observer might not perceive the presence of John the Baptist, Mary Magdalene, Peter the Fisherman or Moses in the painting. However, with regard to the stone tablets, the court finds that an average observer would perceive them to represent the Ten Commandments. The Roman numerals I through X are inscribed in the tablets and defendants provide no alternative with regard to what these tablets might represent.[10]

Defendants assert that the unidentifiable secular figures serve to neutralize the effect of the painting. This argument merits careful consideration. In *Lynch*, the Court found permissible the government's display of a creche as part of its annual Christmas display. *Lynch*, 465 U.S. at 687, 104 S.Ct. at 1366. There, the display celebrated a public holiday having strong secular components. *Id.* at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring). Justice O'Connor, although recognizing the religious significance of the creche, believed that the overall holiday setting of the display helped negate any message of endorsement of Christianity by altering what viewers perceived to be the purpose of the display. *Id.*

Similarly, in *Allegheny*, the court found permissible the government's display of a menorah as part of its winter holiday deco-

---

**10.** The Supreme Court has ruled that a public school may not post a copy of the Ten Commandments. *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam). In this court's opinion, an endorsement of the Judeo–Christian tradition is just as unconstitutional as an endorsement of Christianity alone. *See Allegheny*, 109 S.Ct. 3112 n. 61 (opinion of Blackmun, J.) (citing *Greater Houston Chapter of ACLU v. Eckels*, 589 F.Supp. 222 (S.D.Tex.

1984), *appeal dismissed*, 755 F.2d 426 (5th Cir. 1985), *cert. denied*, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985)). Indeed, "just as government may not favor particular religious beliefs over others, 'government may not favor religious belief over disbelief.'" *Id.* at 3123 (O'Connor, J. concurring in part and concurring in the judgment) (quoting *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 109 S.Ct. 890, 906, 103 L.Ed.2d 1 (Blackmun, J., concurring)).

rations. *Allegheny*, 109 S.Ct. at 3105. Justice Blackmun believed the presence of the menorah, combined with the presence of the Christmas tree and a sign saluting liberty, endorsed neither Christianity nor Judaism. *Id.* at 3111–3114 (opinion of Blackmun, J.). For Justice Blackmun, the secular history of the Christmas tree and the evolvement of Christmas and Chanukah into one winter holiday season neutralized the effect of the menorah. *Id.* Justice O'Connor, however, found nothing in the display to neutralize the religious effect of the menorah but believed that the inclusion of the Christmas tree and the sign saluting liberty in the Christmas display endorsed merely a sense of "pluralism" and "freedom of belief," and not, either Judaism or Christianity. *Id.* at 3122–3124 (O'Connor, J., concurring in part and concurring in the judgment).

Despite the possible neutralizing effect of—or negation of endorsement by—the unidentifiable figures in the painting, this court remains wary of sectarian messages displayed in public schools as they transmit basic and fundamental values to our youth. *Edwards v. Aguillard*, 482 U.S. 578, 583–584, 107 S.Ct. 2573, 2577–2578, 96 L.Ed.2d 510 (1987) (establishment clause must be applied with special sensitivity in the public school context); *see Grand Rapids*, 473 U.S. at 384 n. 6, 105 S.Ct. at 3223 n. 6. "To an impressionable student, even the mere appearance of secular involvement in religious activities might indicate that the state has placed its imprimatur on a particular religious creed. This symbolic inference is too dangerous to permit." *Brandon v. Board of Ed. of Guilderland Cent. School District*, 635 F.2d 971, 978 (2d Cir. 1980); *see Roemer v. Board of Public Works*, 426 U.S. 736, 750, 764, 96 S.Ct. 2337, 2346, 2353, 49 L.Ed.2d 179 (1976). Here, since defendants display Martin's painting in a high school auditorium, stu-

dents view the painting each time they enter the auditorium. Further, defendant School District uses the auditorium for numerous events at which elementary students are required to attend. Susan Affidavit, Doc. 7 at ¶ 4.[11] Accordingly, this court's scrutiny of the painting and its placement must be all the more discriminating. *See Grand Rapids*, 473 U.S. at 390, 105 S.Ct. at 3226 (holding that the inquiry into endorsement test "must be conducted with particular care when many of the citizens perceiving the governmental message are children in their formative years").

Taking into account the significant message behind the Crucifixion and the skeptical way in which the Court views sectarian messages in public schools, this court concludes as a matter of law that the painting has the primary effect of endorsing Christianity. First, the school displays the painting permanently and not part of any holiday setting. Further, the school's display contains no placards to explain the paintings meaning or reason for being there. *Cf. Allegheny*, 109 S.Ct. at 3123 (O'Connor, J., concurring in part and concurring in the judgment) (presence of sign saluting liberty in Christmas display sends message of freedom rather than endorsement of religion); *id.* at 3114–3115 (opinion of Blackmun, J.). Moreover, this is not a case where the school displays the painting as part of a student art exhibit.[12] Finally, the presence of the non-religious figures, rather than neutralizing the religious effect of the painting, blend into the scene of the Crucifixion and complete the picture as an average observer would perceive it to be. Though some negating features may be present, the cross occupies a highly prominent place in the painting and draws the attention of the eye.

The court concludes that the display of Martin's painting in the auditorium of Schuylerville High School violates the sec-

---

**11.** Plaintiffs present uncontested psychological evidence echoing the court's concern over displaying religious messages in schools. *See generally* Scherer Affidavit, Doc. 7.

**12.** Justice O'Connor observed that "a typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content." *Allegheny*, 109 S.Ct. at 3123 (O'Connor, J., concurring in part and concurring in the judgment); *see also id.* at 3118 (O'Connor, J., concurring in part and concurring in the judgment) ("this creche stands alone").

ond prong of the *Lemon* test. The instant painting prominently displays a figure whom the average observer would believe to be Jesus Christ at his crucifixion. The painting lacks any meaningful neutralizing or negating features. Thus, it has the effect of conveying a message of government endorsement of Christianity.

## CONCLUSION

For the foregoing reasons, the court grants plaintiff's motion for summary judgment. The court directs defendant Board of Education of the Schuylerville Central School District to remove the painting within thirty days of the date on which this Memorandum–Decision and Order is filed by the clerk of the court. The clerk is directed to enter judgment for plaintiffs.

It is So Ordered.