976 F.2d 1386
 61 USLW 2328
 CHABAD-LUBAVITCH OF GEORGIA, Yossi New, Rabbi, Yossi Lerman,
Rabbi, Plaintiffs-Appellants,
v.
Zell MILLER, Governor of Georgia, Michael J. Bowers,
Attorney General of Georgia, Luther Lewis, Acting Director,
Georgia Building Authority, Max Cleland, Secretary of State
of Georgia, Defendants-Appellees.
 No. 92-8008.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 10, 1992.
 
 Gerald L. Pouncey, Jr., Morris, Manning & Martin, Atlanta, Ga., Nathan Lewin, Stuart A. Levey, David S. Cohen, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for plaintiffs-appellants.
 Ray O. Lerer, Sr., Asst. Atty. Gen., Atlanta, Ga., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before KRAVITCH and COX, Circuit Judges, and DYER, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Appellants are a Jewish organization and two rabbis who were denied permission by the State of Georgia to display a Chanukah menorah in the State Capitol Rotunda for the eight-day Chanukah observance in 1991. The district court granted summary judgment in favor of the State, based on its conclusion that by permitting the display in the Rotunda the State would send an impermissible message of the State's endorsement of religion in violation of the Establishment Clause.
 
 
 2
 The district court found that the State intentionally opened the Rotunda to numerous varieties of speech and symbolic expression, from political to religious, through its consistent application of a content-neutral, equal access policy. The district court concluded as a matter of law that the Rotunda is a "limited" or "created" public forum, but that the proposed unattended display of a 15-foot tall menorah for an 8-day period was properly denied by the State.
 
 
 3
 We agree with the decision of the district court and adopt its opinion, which we attach as an appendix, as the opinion of this court.
 
 
 4
 AFFIRMED.
 
 APPENDIX
 United States District Court
 Northern District of Georgia
 Atlanta Division
 
 5
 Chabad-Lubavitch of Georgia, Yossi New, and Yossi Lerman
 
 
 6
 vs.
 
 
 7
 Zell Miller, Michael J. Bowers, Luther Lewis, and Max Cleland
 
 Civ. No. 1:90-cv-2730-ODE
 ORDER
 
 8
 This case alleging violations of the First Amendment is before the court on Plaintiffs' motion for partial summary judgment and injunctive relief on Count II of Plaintiffs' Second Amended Verified Complaint and on Defendants' motion for summary judgment.
 
 
 9
 Plaintiff Chabad-Lubavitch of Georgia ("Chabad") is a Hasidic Jewish group based in Georgia which is dedicated to reawakening and educating other Jews and the public on the Jewish faith. Plaintiffs Rabbi Yossi New and Rabbi Yossi Lerman are two members of Chabad. This dispute arises from Plaintiffs' attempt to maintain a menorah on the plaza in front of the State Capitol building in Atlanta, Georgia, or alternatively in the Rotunda of the Captitol Building, for the duration of Chanukah, 1991.
 
 
 10
 The facts in this case are uncontested. Much of the procedural and factual history of this case has previously been recounted in this court's opinion of December 11, 1990 which denied Plaintiffs' motion for temporary restraining order. See Chabad-Lubavitch of Georgia, Inc. v. Harris, 752 F.Supp. 1063 (N.D.Ga.1990). For ease of reference, the court will again summarize the history of the case.
 
 
 11
 During Chanukah, 1989, Plaintiffs erected a fifteen foot high steel menorah on the plaza in front of the State Capitol. The menorah was accompanied by a bright yellow sign which read "HAPPY CHANUKA from CHABAD OF GEORGIA." The menorah was lit in a religious ceremony and remained on the plaza for the eight days of Chanukah. Each day it was re-lit for thirty to forty-five minutes. Prior to placing the menorah on the plaza in 1989, Plaintiffs sought permission from the Georgia Building Authority which, along with the Governor's office, has authority over the Capitol grounds. They received permission from Defendant Luther Lewis, who was then Acting Director of the Georgia Building Authority.
 
 
 12
 During December, 1989, while the menorah was on display, Stanley Gunter of the Governor's staff noticed it. At the hearing on Plaintiffs' motion for temporary restraining order, Mr. Gunter testified that he became concerned about the establishment clause implications of the display and that he resolved to check out that concern if Chabad made another request to display the menorah. At about the same time, Mr. Gunter also noticed a live nativity scene, sponsored and organized by the Georgia Building Authority, in the Rotunda of the Capitol. The nativity scene was surrounded by a Christmas tree, reindeer, gifts and a Santa Claus.
 
 
 13
 Prior to Chanukah, 1990, an employee of Chabad telephoned Mr. Gunter and requested permission to once again erect the menorah on the plaza. A request was also made to repeat the candle-lighting ceremony. On November 1, 1990, the office of Governor Joe Frank Harris sent a letter to Attorney General Michael J. Bowers requesting that he review and analyze the proposed 1990 Rotunda Christmas display, the menorah display and the proposed Chanukah candle-lighting ceremony to determine whether they violated the establishment clause of the First Amendment. In response, the Attorney General sent Governor Harris an opinion letter. That letter concluded that the 1990 Rotunda display, which would have consisted of a live nativity scene and would have been opened with religious music and prayers, violated the establishment clause. As to Plaintiffs' activities, the Attorney General concluded that the candle-lighting ceremony, which included the display of the menorah for a short period in the plaza area, did not violate the First Amendment. However, the Attorney General opined that the display of the menorah for the entire eight days of Chanukah created an impermissible appearance of State sponsorship.
 
 
 14
 On November 14, 1990, Mr. Gunter telephoned Chabad and related the Attorney General's opinion that the menorah display throughout Chanukah would be unconstitutional. At that time, Mr. Gunter denied Chabad's request for the eight day display. A candle-lighting ceremony, including use of the menorah, was approved for December 18, 1990.[1] On December 7, 1990, in response to the denial of their request to display the menorah during the eight days of Chanukah, Plaintiffs filed a complaint and motion for temporary restraining order. Three days later, Plaintiffs filed their first amended complaint. That complaint alleged that by denying Plaintiffs' request to erect and maintain a menorah during Chanukah, Defendants had engaged in content-based discrimination that was not supported by a compelling governmental interest. Chabad sought a preliminary and permanent injunction authorizing and ordering Defendants to permit the erection and maintenance of the menorah on the plaza of the State Capitol for the duration of Chanukah.
 
 
 15
 On December 10, 1990, the court held an evidentiary hearing on Plaintiffs' motion for temporary restraining order. By order dated December 11, 1990, the court denied that motion on the grounds that the Georgia Building Authority Buildings and Grounds Policy, adopted at the annual meeting of the Georgia Building Authority more than two years prior to Plaintiffs' request, forbade the placement of any unattended display on the Capitol grounds. The court found that this policy was a reasonable time, place and manner regulation in that it was "content neutral", "narrowly tailored to serve a significant government interest" and "[left] open ample alternative channels of communication." 752 F.Supp. at 1068. Therefore, the court found that Chabad was unlikely to succeed on the merits in showing a violation of the First Amendment.
 
 
 16
 Chabad immediately filed an emergency motion with the United States Court of Appeals for the Eleventh Circuit. On December 12, the Court of Appeals denied Plaintiffs' emergency motion. Thereafter, Plaintiffs' dismissed their appeal, and elected to proceed to judgment in this court.
 
 
 17
 In January, 1991, Chabad renewed its request to display its menorah on the grounds of the State Capitol. In addition to that request, which was identical to the request of previous years, Chabad made an alternative request to erect its menorah inside the Capitol Rotunda. On March 13, 1991, after receiving no response to either of these requests, Plaintiffs filed a motion to amend their complaint.[2] By order dated April 25, this court granted Plaintiffs' motion as unopposed. Plaintiffs' second amended complaint added a Count II in which Plaintiffs sought a permanent injunction authorizing and ordering Defendants to permit the erection and maintenance of a menorah in the Rotunda of the State Capitol. On November 7, 1991, Plaintiffs filed a motion for partial summary judgment on Count II. The next day, Defendants filed a motion for summary judgment on both counts of Plaintiffs' complaint.
 
 
 18
 For the sake of simplicity, the court will address Defendants' motion for summary judgment first. In Plaintiffs' brief in opposition to Defendants' motion for summary judgment, Plaintiffs acknowledge that the State is entitled to summary judgment on Count I of the complaint. Specifically, Plaintiffs agree that the Georgia Building Authority Buildings and Grounds Policy--which prohibits the placing of unattended objects on the plaza of the State Capitol--has been enforced by the State in a content-neutral manner. As such, Plaintiffs acknowledge that the State may refuse to permit Chabad to place its menorah on the Capitol plaza for the eight-day duration of Chanukah. Accordingly, Defendants' motion for summary judgment as to Count I of Plaintiffs' complaint is GRANTED as unopposed.
 
 
 19
 Defendants' motion for summary judgment as to Count II of the complaint requires substantially more analysis. The parties agree that the Georgia Building Authority Buildings and Grounds Policy, which prohibits the placing of unattended objects on the plaza of the State Capitol, is not applicable to the Rotunda of the State Capitol.[3] Defendants acknowledge that there are no other content-neutral policies which would prohibit unattended displays in the Rotunda. Nonetheless, Defendants believe that they are entitled to summary judgment on Count II of Plaintiffs' complaint and advance two separate arguments to support this claim. The court will address each claim in turn.
 
 
 20
 Defendants' first argument, raised briefly in the memorandum of law in support of Defendants' motion for summary judgment and more extensively in Defendants' response to Plaintiffs' motion for partial summary judgment, rests on the claim that the Capitol Rotunda is not a public forum. As such, Defendants argue that they are entitled to ban the menorah display in order "to preserve the property ... for the use to which it is lawfully dedicated." Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) (citations omitted). Plaintiffs concede that the Rotunda is not a "traditional" public forum. They argue, however, that the State has opened up the Rotunda for use by the public as a place for expressive activity. According to Plaintiffs, this action by the State amounts to the designation of the Rotunda as a "limited" or "created" public forum.
 
 
 21
 In determining whether a governmental body has designated public property as a limited public forum, courts must:
 
 
 22
 [look] to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum. [They must also examine] the nature of the property and its compatibility with expressive activity to discern the government's intent.
 
 
 23
 Cornelius v. NAACP Legal Defense Fund, 473 U.S. 788, 802-03, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567. See also Stewart v. District of Columbia Armory Bd., 863 F.2d 1013, 1017 (D.C.Cir.1988) (courts must examine "the consistent policy and practice of the government"). The Cornelius court, after setting out the above criteria, went on to provide several examples of state policies which are sufficient to designate property as a limited public forum. For example, in Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), the Court found that the policy of a state university to make meeting facilities available to student groups provided clear evidence of an intent to create a public forum. Similarly, in Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), the Court found that a municipal auditorium and a city-leased theater which were, in practice, dedicated to expressive activities constituted a limited public forum.
 
 
 24
 As detailed in Plaintiffs' Statement of Material Facts, over the past nine years the State of Georgia has opened the Rotunda to the citizens of Georgia for use as a place of expressive activity. The State has allowed press conferences by groups such as the Lake Lanier Environmental Watch Group and the National Organization for the Reform of Marijuana Laws. Plaintiffs' Statement of Material Facts, pp 10, 17. It has also allowed cultural events like a rally by the Friends of Independent Living and a Holocaust Commemoration sponsored by numerous Jewish groups. Id. at pp 23, 26. Finally the State has permitted private citizens and groups to erect displays in the Rotunda. For example, an 18-foot tall Indian Teepee has been displayed numerous times in connection with the annual Indian Heritage Week. Id. at pp 35, 38-40, 43. The undisputed evidence shows that the above described historical, educational and cultural events, and many others, have been permitted by the State in conformity with a content-neutral, equal access policy and that the State has allowed access to the Rotunda on a first-come, first-serve basis to all interested parties.[4] See Defendants' Response To Plaintiffs' Statement Of Material Facts, pp 10-29.
 
 
 25
 A review of the diverse list of speech and events permitted in the Rotunda makes it patently clear that the State of Georgia has designated the Rotunda as a limited public forum. Numerous varieties of speech and symbolic expression, from political to religious, have been permitted in the Rotunda. Through its consistent practice over the past nine years, the State has revealed its intent to open up the Rotunda to assembly and debate. Cornelius, 473 U.S. at 802-03, 105 S.Ct. at 3449. Therefore, it has designated the Rotunda as a limited public forum.[5]
 
 
 26
 Defendants make a second argument which is closely related to the public forum argument. Defendants maintain that even if the Capitol Rotunda has become a limited public forum by virtue of the State's grant of access to various groups, the resulting constitutional right to speak extends only to other entities of "similar character". The State distinguishes between the secular displays that have been permitted in the Rotunda and the menorah display at issue in the instant case and argues that allowing secular displays in the Rotunda should not be construed as opening the forum to religious symbols.
 
 
 27
 This argument misconstrues the implications of designating public property as a limited public forum. The State's attempt at distinguishing between religious and secular speech constitutes content-based discrimination. Congregation Lubavitch v. City of Cincinnati, 923 F.2d 458, 460 (6th Cir.1991) ("Discrimination against religious speech as such is content-based...."); Chabad-Lubavitch of Georgia, 752 F.Supp. at 1066. Once property has been designated as a limited public forum by opening it generally to the public, content-based distinction is permissible only if narrowly tailored to serve a compelling state interest. Widmar, 454 U.S. at 270, 102 S.Ct. at 274. "The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place." Id. at 267-68, 102 S.Ct. at 273. Applicable precedent provides no legal support for Defendants' argument that religious displays may be excluded from the Rotunda, while all other forms of speech are allowed.[6]
 
 
 28
 The recognition of the Rotunda as a limited public forum provides only a starting point for analysis of this dispute. As described above, under well-established First Amendment jurisprudence, in order to restrict protected speech[7] in a public forum based on content, the State must meet the test of strict scrutiny, i.e., Defendants must show that the restriction is narrowly tailored to serve a compelling state interest. Widmar, 454 U.S. at 270, 102 S.Ct. at 274.[8] Defendants contend that the need to avoid a violation of the establishment clause amounts to a compelling state interest sufficient to satisfy the strict scrutiny test. The Supreme Court has held that the need to avoid an establishment clause violation does represent a compelling state interest, but only if the proposed speech actually violates the clause. Widmar, 454 U.S. at 271, 102 S.Ct. at 275. Thus, Defendants' second argument in support of their motion for summary judgment is that permitting the erection of the Chabad menorah inside the Capitol Rotunda would be a violation of the establishment clause.
 
 
 29
 In the instant case, the court has already implicitly recognized that the menorah is a religious symbol. Chabad-Lubavitch, 752 F.Supp. at 1066-67.[9] Neither party contests this conclusion. The determination of whether the display of a religious symbol on government property contravenes the First Amendment's establishment clause is controlled by the line of cases which began with Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).[10] Over the course of the twenty years since the Lemon test was developed, lower federal courts have consistently used it to determine the constitutionality of various religious displays. The Supreme Court, however, has seemingly resisted applying the test to every case of religious displays. See Doe v. Small, 934 F.2d 743, 757-58 (7th Cir.1991) ("the Supreme Court itself has resisted wholeheartedly adopting the test in every case"). As recently as Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), in which the Court upheld the display of a creche by the city of Pawtucket, Rhode Island, the Court expressed its doubts about the continuing validity of the Lemon test, stating, "we have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area." 465 U.S. at 679, 104 S.Ct. at 1362 (quoted in Doe, 934 F.2d at 758). Nevertheless, Chief Justice Burger applied the three prongs of the Lemon test in his majority opinion upholding the creche. 465 U.S. at 681, 104 S.Ct. at 1363.
 
 
 30
 In the most recent applicable case, the Supreme Court appears to have returned to the Lemon test, putting emphasis on the second prong--the appearance or effect of endorsing religion. Justice Blackmun, writing the opinion of the Court, explained:
 
 
 31
 [T]he government's use of religious symbolism is unconstitutional if it has the effect of endorsing religious beliefs, and the effect of the government's use of religious symbolism depends upon its context.
 
 
 32
 County of Allegheny v. ACLU, 492 U.S. 573, 597, 109 S.Ct. 3086, 3103, 106 L.Ed.2d 472 (1991). Justice Blackmun found that this test accurately portrayed the relevant constitutional principles at issue in religious display cases. Id. at 597, 109 S.Ct. at 3103 ("[t]hese general principles are sound, and have been adopted by the Court in subsequent cases.").
 
 
 33
 In Allegheny, the Supreme Court examined the constitutionality of two privately owned holiday displays which were erected on public property in the city of Pittsburgh. The first display was a creche depicting the Christian nativity scene which was placed on the "Grand Staircase" in the center of the Allegheny County Courthouse. The creche was not accompanied by any other decorations or placed next to any secular ornaments. The second display was a Chanukah menorah, similar to the one in the instant case, placed outside the City-County Building next to a Christmas tree and a sign saluting liberty. Id. at 578, 109 S.Ct. at 3093. The Court divided sharply on the issue of whether these private displays on public property violated the establishment clause.
 
 
 34
 The division of the Court resulted in two different majorities. A majority consisting of Justices Blackmun, Brennan, Marshall, Stevens and O'Connor held that the display of the creche in the county courthouse violated the establishment clause. Justice Blackmun, joined by Justice O'Connor, wrote for the Court. Justice Blackmun focused on the "context" in which the display was placed:
 
 
 35
 ... the Court has made clear that, when evaluating the effect of government conduct under the Establishment Clause, we must ascertain whether 'the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices.' ... Accordingly, our present task is to determine whether the display of the creche ... in [its] 'particular physical setting[ ],' has the effect of endorsing or disapproving religious beliefs.
 
 
 36
 492 U.S. at 597, 109 S.Ct. at 3103 (citations and footnote omitted, emphasis added).
 
 
 37
 In finding the creche display unconstitutional, Justice Blackmun explained:
 
 
 38
 ... nothing in the context of the display detracts from the creche's religious message. The [display at issue in Lynch v. Donnelly, 465 U.S. 668 [104 S.Ct. 1355, 79 L.Ed.2d 604] (1984) ] composed a series of figures and objects, each group of which had its own focal point. Santa's house and his reindeer were objects of attention separate from the creche, and had their specific visual story to tell. ... Here, in contrast, the creche stands alone: it is the single element of the display on the Grand Staircase.[11]
 
 
 39
 * * * * * *
 
 
 40
 Furthermore, the creche sits on the Grand Staircase, the 'main' and 'most beautiful part' of the building that is the seat of county government.... No viewer could reasonably think that it occupies this location without the support and approval of the government. Thus, by permitting the 'display of the creche in this particular physical setting,' ... the county sends an unmistakable message that it supports and promotes the Christian praise to God that is the creche's religious message.
 
 
 41
 492 U.S. at 598-600, 109 S.Ct. at 3104 (citations and footnotes omitted, emphasis added).[12]
 
 
 42
 In contrast, a majority consisting of Chief Justice Rehnquist and Justices White, Blackmun, O'Connor, Scalia and Kennedy found that the display of the menorah did not violate the establishment clause. Justice Blackmun explained:
 
 
 43
 ... the menorah here stands next to a Christmas tree and a sign saluting liberty. While no challenge has been made here to the display of the tree and the sign, their presence is obviously relevant in determining the effect of the menorah's display. The necessary result of placing a menorah next to a Christmas tree is to create an 'overall holiday setting' that represents both Christmas and Chanukah--two holidays, not one.
 
 
 44
 492 U.S. at 614, 109 S.Ct. at 3112. Justice Blackmun concluded that the display which represented both Christmas and Chanukah "are part of the same winter-holiday season, which has attained a secular status in our society." Id. at 616, 109 S.Ct. at 3113.[13] Thus, the Allegheny case teaches that, in ascertaining whether the display of a religious symbol conveys a message of government endorsement of religion in violation of the establishment clause, the court must examine the context in which the religious symbol is displayed. This focus on context is consistent with the Court's earlier jurisprudence in this area. See Lynch v. Donnelly, 465 U.S. 668, 692, 104 S.Ct. 1355, 1369 (O'Connor, J., concurring and finding that the constitutionality of a religious display depends on its "particular physical setting"); Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (holding that the display of the Ten Commandments on the walls of public classrooms violates the Establishment Clause under similar rationale).
 
 
 45
 Chabad's proposed menorah display in the Rotunda would be virtually identical, in terms of its physical context, to the illicit creche display in Allegheny. If the State complied with Chabad's request, the fifteen-foot steel menorah would be displayed in the heart of the State Capitol. It would not be surrounded by other secular symbols of the holiday season. Rather, it would be a prominent and isolated structure and not visually part of any comprehensive secular display.[14]
 
 
 46
 Allegheny held that the unaccompanied display of a creche, a clearly religious symbol, in the center of an important county building violated the establishment clause by leading a viewer to the inescapable conclusion that the symbol has the support and approval of the government. 492 U.S. at 600, 109 S.Ct. at 3105. The logical extension of the Allegheny decision is that the display of a religious symbol like a menorah, in the center of a state capitol building, unadorned by secular symbols, also conveys a message of government endorsement of religion which is impermissible under the establishment clause. The Second Circuit, in a case remarkably similar to the instant case, reached the same conclusion. In Kaplan v. City of Burlington, 891 F.2d 1024 (2nd Cir.1989), the Court of Appeals reviewed the dismissal by a District Court of a complaint which challenged a city's decision to permit the placement of a menorah in a city hall park by a private group. The menorah, like the creche in Allegheny and the menorah in this case, was displayed on public property which was closely associated with a core government function and was displayed alone. The Court of Appeals reversed the District Court's dismissal of the complaint, finding that "Allegheny teaches that the display of a menorah on government property in this case conveys a message of government endorsement of religion in violation of the Establishment Clause." 891 F.2d at 1024. Compare Americans United For Separation of Church and State v. City of Grand Rapids, 922 F.2d 303 (6th Cir.1990) (speculating that Allegheny does not prohibit the erection of a privately-owned menorah on a municipal plaza).
 
 
 47
 Plaintiffs offer two arguments which they believe distinguish this case from Allegheny. The first is that the Georgia State Capitol Rotunda, unlike the courthouse in Allegheny, is a public forum. According to Plaintiffs, the erection of a privately owned religious symbol in a public forum for a relatively short period of time in a public forum would not convey a message of governmental sponsorship, even if the forum is inside a governmental building. Plaintiffs argue that persons who view the menorah in the Rotunda would do so in the context of the State's longstanding practice of opening the Rotunda to a broad spectrum of protected speech and thus would not mistake the display for a state sponsored event. In support of this argument, Plaintiffs point out that this court, in its November 11, 1990 order which denied Plaintiffs' motion for a temporary restraining order, found no binding authority which would extend the Allegheny holding from the non-public into the public forum. However, after a review of the rationale of Allegheny the court is compelled to hold that Allegheny does apply to this case.
 
 
 48
 In Allegheny, the Court found that the context of the creche caused viewers to mistakenly conclude that the display had the endorsement of the government. This finding turned on the fact that the creche stood alone and was disassociated from other secular symbols. The menorah in this case would be similarly isolated. It is uncontested that the Rotunda, where the menorah would be displayed, is a location where others are free to engage in speech and to place displays. Common sense dictates, however, that many of the persons who enter the Capitol Building and view the Chabad menorah would be unaware of that previous activity. Those persons would not view the menorah in the context of the State's longstanding practice of opening the Rotunda to a broad spectrum of protected speech. Instead, the persons viewing an isolated menorah in the center of the State Capitol would, in all likelihood, conclude that the menorah occupies the center of the Capitol with the support and approval of the State of Georgia. By permitting the display of the menorah in that setting, the State would send a message that it supports the religious message conveyed by the menorah.
 
 
 49
 The conclusion that the public forum status of the Rotunda does not change the result compelled by Allegheny is supported by the Supreme Court's decision in Widmar. There, the Court indicated that whether a given forum is public or not is only one factor to be considered in determining whether the context of a display indicates that the government has placed its imprimatur on the message. 454 U.S. at 274, 102 S.Ct. at 276. Allegheny makes it clear that the physical context of the display is the most important factor to be considered. Here, despite the fact that the Rotunda is a public forum, the physical context of the menorah display would communicate a message which violates the First Amendment. See Kaplan, 891 F.2d at 1028.
 
 
 50
 Plaintiffs' second argument in attempting to distance this case from Allegheny is contained in their brief in opposition to Defendants' motion for summary judgment. Briefly stated, Plaintiffs argue that Allegheny cannot be applicable because their right to display a menorah cannot turn on whether the State has chosen to erect a Christmas tree at the time of their request. That is not the implication of the rule announced in Allegheny nor is it the holding of the court today. The decision of the court today is limited to a finding that the erection by Chabad of a menorah in the Rotunda of the State Capitol, unaccompanied by other secular symbols, would violate the establishment clause of the First Amendment. It may well be, though the court does not reach the issue, that Plaintiffs could legally erect a display in the Rotunda which included both secular symbols and a menorah without implicating the establishment clause. It is clear, however, that Plaintiffs' intended display of a fifteen-foot tall, unattended menorah in the Rotunda would result in a violation of the establishment clause. As such, Defendants have presented a compelling interest sufficient to restrict Plaintiffs' First Amendment speech. Therefore, Defendants are entitled to summary judgment on Count II of Plaintiffs' second amended complaint. Under these circumstances, Plaintiffs' motion for partial summary judgment on Count II must be denied.
 
 
 51
 Accordingly, Defendants' motion for summary judgment [# 32-1] is GRANTED. Plaintiffs' motion for partial summary judgment and for injunctive relief [# 31-1] is DENIED.
 
 
 52
 SO ORDERED, this 5 day of December, 1991.
 
 
 53
 /s/ Orinda D. Evans
 
 ORINDA D. EVANS
 United States District Judge
 
 54
 KRAVITCH, Circuit Judge, concurring in part and dissenting in part:
 
 
 55
 I agree that the Rotunda is a created public forum. I also agree that the State has identified a compelling governmental interest for its content-based restriction on Chabad's religious speech. I disagree, however, with the extent to which, in finding that compelling interest, the district court discounts the Rotunda's status as a public forum. More disturbingly, the district court, and thus the majority, conspicuously neglects to hold the State to the second part of its burden under strict scrutiny--proving that its action is narrowly tailored to the compelling state interest it asserts. I therefore respectfully dissent from the affirmance by the majority of the district court's grant of summary judgment. I would remand the case for the district court to determine whether the State has shown that completely banning the menorah display is the least restrictive way for the State to avoid violating the Establishment Clause.
 
 I.[1]
 
 56
 Central to this case is the fact that the State has made the Rotunda a public forum for First Amendment purposes. The public-forum setting is significant for two reasons. First, it brings into the constitutional equation Chabad's First Amendment rights to free speech and the free exercise of religion. As the district court correctly explains, to constitutionally impose a content-based restriction on private speech in a public forum, the State must satisfy the two criteria of strict scrutiny. It must furnish a compelling governmental interest for the restriction and must show that the restriction is narrowly tailored to achieving that interest. The State bears the burden of proving both elements. See, e.g., Burson v. Freeman, --- U.S. ----, 112 S.Ct. 1846, 1851, 119 L.Ed.2d 5 (1992). These principles apply to religious and nonreligious speech alike. See Widmar v. Vincent, 454 U.S. 263, 269-70, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981).
 
 
 57
 The public-forum setting does more, however, than merely trigger strict scrutiny: It also is an important factor in determining whether strict scrutiny is satisfied--whether the State's asserted interest in restricting particular private religious speech in a public forum is in fact sufficiently compelling to satisfy the first prong of strict scrutiny. The majority and the district court unfortunately fail to recognize this second way in which the public-forum context affects the constitutional analysis.
 
 A.
 
 58
 The district court properly points out that avoiding a violation of the Establishment Clause is a compelling state interest. See ante at 1391 (citing Widmar, 454 U.S. at 271, 102 S.Ct. at 275). The fundamental question underlying the first prong of strict scrutiny in this case, therefore, is whether the State would offend the Establishment Clause if it were to permit the menorah display.
 
 
 59
 The State violates the Establishment Clause when a reasonable observer would perceive the State's actions as endorsing religion. See County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 620, 109 S.Ct. 3086, 3115, 106 L.Ed.2d 472 (1989); Lynch v. Donnelly, 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring); Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).[2] In the public-forum context, the State's only act is establishing and implementing a general policy of granting private persons equal access to its public forum, a policy mandated by the Free Speech and Free Exercise Clauses of the First Amendment. See Widmar, 454 U.S. at 276, 102 S.Ct. at 277-78.[3] In this case, for example, the State obviously does not seek to display the menorah. Nor does the State want to give Chabad special permission that it refuses other private speakers. The act the State claims would violate the Establishment Clause is permitting Chabad to disseminate its private message on the same terms the State has permitted numerous nonreligious groups to disseminate theirs. In cases like this, therefore, the pertinent Establishment Clause question is whether maintaining a policy of equal access to a public forum would create an impermissible perception of government sponsorship if a private organization were to display a religious symbol pursuant to that policy.
 
 
 60
 This question is fundamentally different from the pertinent question in non-public-forum cases, ones in which the government is the speaker or affirmatively promotes the religious speech. In those situations the relevant state act is the direct promotion of the religious message. Accordingly, the Establishment Clause inquiry focuses on whether the religious speech itself creates a perception of state endorsement. This distinction is important because it is far more likely that directly promoting religious speech will convey the notion that the State is supporting religion than will merely providing a forum for both religious and nonreligious speech. The Supreme Court implicitly acknowledged this difference in Allegheny County when it distinguished that case, in which the government directly associated itself with a religious display in the county courthouse, a non-public forum, from public-forum cases. See Allegheny County, 492 U.S. at 600 n. 50, 109 S.Ct. at 3104 n. 50.[4] Of course, the physical context of the religious display, so central to the analyses of the Supreme Court in Allegheny County and the district court in this case, also is important in determining whether an equal-access policy creates a perception of state sponsorship of religion. The somewhat different focus in public-forum cases, however, requires the court to pay special attention to the history of the forum as a public one in addition to considering closely the display's physical context.
 
 
 61
 In Widmar v. Vincent, supra, and Board of Education v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), the Supreme Court identified two factors that are "especially relevant" when evaluating whether an equal-access policy sends a message of state sponsorship. First, the Court recognized that, by its very nature, a public forum generally does not "confer any imprimatur of state approval on religious sects or practices." Mergens, 496 U.S. at 248, 110 S.Ct. at 2371 (quoting Widmar, 454 U.S. at 274, 102 S.Ct. at 276). The Court explained that "there is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." Mergens, 496 U.S. at 250, 110 S.Ct. at 2372 (emphasis in original). The second factor the Court stressed is the extent to which the forum is available to nonreligious as well as religious speakers. Widmar, 454 U.S. at 274, 102 S.Ct. at 277. The greater the access nonreligious speakers have to the public forum, the less likely it is that the reasonable observer would perceive that the government is endorsing religion when it allows religious speakers also to have access.
 
 
 62
 The district court in this case mentions Widmar simply to note that whether the forum is public "is only one factor to be considered" in determining whether the endorsement test is satisfied. Ante at 1395. The court quickly dismisses that factor, however, rejecting the notion that the setting's history as a public forum affects the constitutional analysis. To the contrary, the court reasons, "[c]ommon sense dictates that many of the persons who enter the Capitol Building and view the Chabad menorah would be unaware" of the volume of nonreligious speech the State has allowed there. Ante, at 1395. The problem with the court's reasoning is that it runs contrary to the Supreme Court's concept of the "reasonable observer." In her concurring opinion in Allegheny County, Justice O'Connor, who first identified the views of the "reasonable observer" as the proper constitutional benchmark, see Witters v. Washington Dep't of Servs. for the Blind, 474 U.S. 481, 493, 106 S.Ct. 748, 755, 88 L.Ed.2d 846 (1986) (O'Connor, J., concurring in part and in the judgment), explained that the reasonable observer is presumed to know the history of the forum's use: The " 'history and ubiquity' of a practice ... provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion." Allegheny County, 492 U.S. at 630, 109 S.Ct. at 3121 (O'Connor, J., concurring). To hinge a speaker's First Amendment rights on the limited relevant knowledge and experience of a casual or first-time visitor to the Rotunda would be to "create an obtuse observer's veto [over private religious speech in a public forum], parallel to a heckler's veto over unwelcome political speech." Doe v. Small, 964 F.2d 611, 630 (7th Cir.1992) (en banc) (Easterbrook, J., concurring).
 
 
 63
 Of course, the fact that the setting is a public forum does not preclude the perception of government sponsorship of religion. To hold that it does would be to hold that the Free Speech and Free Exercise Clauses always trump the Establishment Clause, a proposition supported by neither the text nor the history of the Constitution. Religious speech may so dominate a public forum that a policy of equal access becomes indistinguishable from endorsement. See Widmar, 454 U.S. at 275, 102 S.Ct. at 277; Doe, 964 F.2d at 625 (Cudahy, J., concurring in the judgment). Likewise, when the public forum's governmental context is especially pronounced, a perception might arise of a "mixed public/private message and messenger." Doe, 964 F.2d at 628 (Flaum, J., concurring in the judgment). I simply stress two points: (1) the analytical focus in public-forum cases should be on the perception created by the State's policy of equal access, not on the one created by the display per se;[5] and (2) the fact that the government ordinarily is not deemed to endorse private speech made in a public forum is an important factor that must be carefully weighed along with the physical context in which the display exists.[6]
 
 
 64
 When one frames the proper question and pays due regard to all relevant constitutional factors, it becomes an extremely close question whether the State would send an impermissible message of endorsement by allowing Chabad to display its menorah in accordance with the State's policy of equal access. On the one hand, the State's history of allowing in the Rotunda all kinds of religious and nonreligious speech is powerful evidence that the reasonable observer would not believe that the State endorses the messages it permits there. The reasonable observer, for example, probably would not believe that the State of Georgia endorses the views of the National Organization for the Reform of Marijuana Laws, a private group it has allowed to speak in the Rotunda. In addition, the fact that a majority of persons who use the Rotunda are nonreligious speakers further dilutes the perception of state sponsorship. On the other hand, the government presence in this particular public forum is unusually pervasive. Here, the setting is the seat of state government. The giant menorah, indisputably a religious symbol, would stand fifteen feet tall in the center of the Capitol's chief public area for more than a week. Chabad's proposed sign, "HAPPY CHANUKAH FROM CHABAD OF GEORGIA," in no way disclaims state sponsorship. Because the menorah would be unattended most of the time, no countervailing perception of private sponsorship would be created. On balance, therefore, I agree with the district court that a perception of state endorsement of religion arises.[7] As such, the State has overcome its first hurdle for summary judgment, identifying a compelling governmental interest for prohibiting the menorah display.
 
 B.
 
 65
 Demonstrating a compelling state interest is only the first of two hurdles the State must overcome to survive strict scrutiny and justify infringing on the Free Speech and Free Exercise rights of a religious speaker in a public forum. "To survive strict scrutiny ... a state must do more than assert a compelling state interest--it must demonstrate that its law [or other action] is necessary to serve the asserted interest." Burson, --- U.S. at ----, 112 S.Ct. at 1852 (emphasis added). A complete ban may be necessary in some circumstances, "but only if each activity within the proscription's scope is an appropriately targeted evil." Frisby v. Schultz, 487 U.S. 474, 485, 108 S.Ct. 2495, 2503, 101 L.Ed.2d 420 (1988). In the instant case, therefore, the State may prevail only if it proves that completely banning the menorah display is necessary to avoid an Establishment Clause violation.
 
 
 66
 After explaining why the unattended menorah with no specific sign of disclaimer would violate the Establishment Clause, the district court jumps directly to the conclusion that the State is entitled to summary judgment. The court writes:
 
 
 67
 It is clear ... that Plaintiffs' intended display of a fifteen-foot tall, unattended menorah in the Rotunda would result in a violation of the [E]stablishment [C]lause. As such, Defendants have presented a compelling interest sufficient to restrict Plaintiffs' First Amendment speech. Therefore, Defendants are entitled to summary judgment....
 
 
 68
 Ante, at 1395. The court simply fails to complete the strict scrutiny analysis.[8] It never considers that some action short of total prohibition might prevent the reasonable observer from perceiving that the State has endorsed the menorah display.
 
 
 69
 Completely banning the menorah display is not so obviously the least restrictive way for the State to avoid violating the Establishment Clause that we may assume such a finding is implicit in the district court's grant of summary judgment for the State. A sign, for example, clearly explaining that the menorah belongs solely to Chabad, a private organization, and explicitly disclaiming state sponsorship, might prevent the reasonable observer from believing that the State endorses the display. At oral argument, Chabad acknowledged that it would be willing to erect an appropriate disclaimer sign. Significantly, in Allegheny County the Court stated that, although no sign can disclaim an "overwhelming" message of endorsement, an "explanatory plaque" may be sufficient to negate an implication of state endorsement otherwise arising. 492 U.S. at 619, 109 S.Ct. at 3114-15. When the setting is a public forum and the reasonable observer already would have a strong sense that the State does not endorse the private speech it allows there, a remedy short of total prohibition appears particularly appropriate. At the very least, the availability of other remedies seems to present a genuine issue of material fact.
 
 II.
 
 70
 The district court failed to perform the "narrowly tailored" portion of the test of strict scrutiny. Accordingly, I would vacate the entry of summary judgment and remand the case to the district court for a determination whether the State has shown, as a matter of law, that completely banning the menorah display is the least restrictive way for it to avoid violating the Establishment Clause. See Doe, 964 F.2d at 622 (holding complete ban on religious display not narrowly tailored and remanding case); see also Smith v. County of Albemarle, 895 F.2d 953, 960 (4th Cir.) (affirming district court's finding that complete ban was narrowly tailored), cert. denied, --- U.S. ----, 111 S.Ct. 74, 112 L.Ed.2d 48 (1990); Kaplan v. City of Burlington, 891 F.2d 1024, 1030 (2d Cir.1989) (finding complete ban narrowly tailored), cert. denied, 496 U.S. 926, 110 S.Ct. 2619, 110 L.Ed.2d 640 (1990). The State, of course, need not maintain the Rotunda as a public forum. "[A] State is not required to indefinitely retain the open character of [created public forums]" as it must with traditional public forums like streets and parks. Perry Educ. Ass'n v. Perry Local Educators Ass'n, 460 U.S. 37, 45-46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). As long as the State keeps the Rotunda open for public discourse, however, it may not discriminate in that forum against certain types of speech, religious or otherwise, unless it proves that such discrimination is necessary to serve its asserted governmental interest.
 
 
 
 [1]
 The Christmas display was also modified in light of the Attorney General's letter. In 1990, it consisted only of a Christmas tree and was unveiled in a ceremony in which choirs sang secular and religious songs. Apparently, the 1991 display will be similar
 
 
 [2]
 The State eventually took action on Plaintiffs' request to erect a menorah display. By letter dated November 27, 1991 from Ray O. Lerer of the Attorney General's Office to Plaintiffs' counsel, the State approved Chabad's request to hold a Chanukah candle lighting ceremony at the Capitol. Chabad's request to leave an unattended menorah on Capitol grounds or in the Rotunda was denied
 
 
 [3]
 The State does not interpret the term "grounds" as used in the Buildings and Grounds Policy to pertain to the area inside the State Capitol building, including the Rotunda. See Defendants' Statement of Material Facts As To Which There Is No Genuine Issue, p 23
 
 
 [4]
 In fact, as Plaintiffs point out, the State does not assert that it has ever denied any group's request to hold an event or erect a display in the Rotunda
 
 
 [5]
 Defendants argue that the government does not create a public forum merely by permitting limited discourse on public property, but only by intentionally opening up that property for public discourse. Defendants cite United States v. Kokinda, 497 U.S. 720, ----, 110 S.Ct. 3115, 3119, 111 L.Ed.2d 571 (1990) as support for the claim that the only way to intentionally open up public property for public discourse is to "expressly designate" the property as a public forum. Defendants' argument misconstrues Kokinda. Kokinda cites Cornelius v. NAACP Legal Defense and Educational Fund, cited supra, with approval. 497 U.S. at ----, 110 S.Ct. at 3121. Cornelius explicitly provided that courts must "look to the policy and practice of government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." 473 U.S. at 802-03, 105 S.Ct. at 3449. As the Second Circuit has explained, "intent is not merely a matter of stated purpose. Indeed, it must be inferred from a number of objective factors, including: [the government's] policy and past practice, as well as the nature of the property...." Paulsen v. County of Nassau, 925 F.2d 65 (2nd Cir.1991). The policy and past practice of the State of Georgia to provide equal access to the Rotunda on a content-neutral basis establishes that the Rotunda is a limited public forum
 
 
 [6]
 That is not to say that a public forum may not be created for a limited purpose, such as only for use by certain groups or only for discussion of certain subjects. See Perry, 460 U.S. at 45 n. 7, 103 S.Ct. at 955 n. 7. The State of Georgia does not contend that it has created such a limited-purpose forum. Because the State has created a forum generally open for use by the public, it has "assumed an obligation to justify its discriminations and exclusions under applicable constitutional norms." Widmar, 454 U.S. at 267, 102 S.Ct. at 273 (footnote omitted)
 
 
 [7]
 The court has already determined that the menorah display constitutes symbolic speech which is "squarely within the ambit of protected speech." Chabad-Lubavitch of Georgia, 752 F.Supp. at 1066
 
 
 [8]
 The standards applicable to content-based discrimination are identical for limited and traditional public fora. Perry, 460 U.S. at 46, 103 S.Ct. at 955
 
 
 [9]
 All of the Supreme Court Justices in Allegheny seem to agree with this conclusion, although Justice Blackmun indicated that his view is that the menorah's message is "not exclusively religious." 492 U.S. at 613, 109 S.Ct. at 3111. Other Circuit Courts which have considered the issue have found that the menorah is a religious symbol. See e.g., Kaplan 891 F.2d at 1028
 
 
 [10]
 The three-prong Lemon test provides:
 [A] statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose; must neither advance nor inhibit religion in its principal or primary effect; and must not foster an excessive entanglement with religion.
 403 U.S. at 612-13, 91 S.Ct. at 2111.
 
 
 [11]
 The Court noted that the presence of other Christmas decorations elsewhere in the county courthouse failed to negate the endorsement effect of the creche. 492 U.S. at 598 n. 48, 109 S.Ct. at 3104 n. 48
 
 
 [12]
 Justices Brennan, Marshall and Stevens reached the same conclusion on the rationale that "the display of an object that 'retains a specifically Christian [or other] religious meaning,' ... is incompatible with the separation of church and state demanded by our Constitution." 492 U.S. at 637, 109 S.Ct. at 3124 (Brennan, J., concurring in part and dissenting in part) (citations omitted). Thus, these three justices would not allow any publicly supported display of religious symbols. See Kaplan v. City of Burlington, 891 F.2d 1024, 1028 (2nd Cir.1989)
 
 
 [13]
 The other Justices who approved the menorah display did so on the grounds that the government was not using its "power to coerce ... to further the interests of Christianity or Judaism...." As is evident from this quote, the opinion of Justice Kennedy, joined by the Chief Justice and Justices White and Scalia, advocated the adoption of an approach different from the Lemon test in religious display cases. 492 U.S. at 655, 109 S.Ct. at 3134 (Kennedy, J., concurring in part and dissenting in part)
 
 
 [14]
 While the State has indicated its intent to erect a Christmas tree inside the Rotunda, the tree would not be displayed until after Chanukah ends on December 8
 
 
 [1]
 I note, preliminarily, that this case should not be dismissed as moot, despite the fact that Chabad's amended complaint seeks injunctive relief for Chanukah 1991. A case that otherwise is moot remains justiciable by the federal courts if (1) a reasonable expectation exists that the same complaining party will be subjected once again to the same challenged action and (2) the challenged action is too short in duration for the case to be fully litigated prior to the action's cessation or expiration. Murphy v. Hunt, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (per curiam) (citing Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam)). Chabad likely will again seek permission to display its menorah. Indeed, at oral argument it confirmed as much. Furthermore, if we were to dismiss the case as moot because the particular Chanukah in question has past, the unyielding nature of the calendar would preclude the litigation from being resolved on the merits: It would be difficult, if not impossible, for Chabad to request permission to display the menorah, to await a response from the State, to obtain a decision on the merits in the district court, and to obtain review in this court, all in the span of less than a year before the annual Chanukah observance comes and goes. Consequently, we properly address the merits of the case
 
 
 [2]
 Although Lemon, Lynch, and Allegheny County have been criticized by several justices, the Court recently declined to reconsider them. See Lee v. Weisman, --- U.S. ----, ----, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992). Thus, the "endorsement" test remains the law in this circuit. See, e.g., Jager v. Douglas County Sch. Dist., 862 F.2d 824, 831 (11th Cir.) (quoting Wallace v. Jaffree, 472 U.S. 38, 56 n. 42, 105 S.Ct. 2479, 2489 n. 42, 86 L.Ed.2d 29 (1985)), cert. denied, 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989)
 
 
 [3]
 Although the State need not retain nontraditional forums like the Rotunda as public forums indefinitely, as long as it does it may not deny particular speakers access to them unless such discrimination is necessary to serve a compelling governmental interest. See Perry Educ. Ass'n v. Perry Local Educators Ass'n, 460 U.S. 37, 45-46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)
 
 
 [4]
 The Court made clear that the question of religious displays in a public forum is an open one:
 The Grand Staircase does not appear to be the kind of location in which all were free to place their displays for weeks at a time, so that the presence of the creche in that location for over six weeks would then not serve to associate the government with the creche. Even if the Grand Staircase occasionally was used for displays other than the creche (for example, a display of flags commemorating the 25th anniversary of Israel's independence), it remains true that any display located there fairly may be understood to express views that receive the support and endorsement of the government. In any event, the county's own press releases made clear to the public that the county associated itself with the creche. Moreover, the county created a visual link between itself and the creche: it placed next to official county signs two evergreens identical to those in the creche display. In this respect, the creche here does not raise the kind of "public forum" issue, cf. Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), presented by the creche in McCreary v. Stone, 739 F.2d 716 (CA2 1984), aff'd by an equally divided Court, sub nom. Board of Trustees of Scarsdale v. McCreary, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985) (private creche in public park).
 Id. n. 50 (emphasis added) (citations partially omitted).
 
 
 [5]
 The Second Circuit acknowledged this point in Kaplan v. City of Burlington, 891 F.2d 1024 (2d Cir.1989), cert. denied, 496 U.S. 926, 110 S.Ct. 2619, 110 L.Ed.2d 640 (1990), a case upon which the district court expressly relies. See id. at 1030 ("the City's equal-access policy is incompatible with the Establishment Clause") (emphasis added)
 
 
 [6]
 Indeed, in an earlier proceeding in this case, the district court held that "[ [p] ]ermitting religious speech in a public forum in and of itself 'does not confer any imprimatur of state approval on religious sects or practices' any more than permitting political speech conveys governmental endorsement of a political group." Chabad Lubavitch of Georgia v. Harris, 752 F.Supp. 1063, 1067 (N.D.Ga.1990) (quoting Kaplan, 891 F.2d at 1033 (Meskill, J., dissenting)) (motion for temporary restraining order). The court "reject[ed] the notion that the citizenry of Georgia are likely to mistake a menorah labelled as the property of Chabad for a state sponsored event." Id
 
 
 [7]
 I recognize that this analysis is extremely fact specific. As the district court acknowledges, different combinations of disclaimer signs, location, accoutrements, menorah size, etc., may lead to completely different results from case to case. The fact-specific character of the analysis, however, is the inevitable result of the Supreme Court's endorsement test, which remains the law of the land and is binding upon this court. See Lee v. Weisman, --- U.S. ----, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992) (expressly declining to reconsider Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and its progeny)
 
 
 [8]
 The majority confirms as much in its short statement adopting the district court's opinion when it cites, as the district court's lone reason for granting summary judgment for the State, the district court's "conclusion that by permitting the display in the Rotunda the State would send an impermissible message of the State's endorsement of religion in violation of the Establishment Clause." Ante, at 1387